Exhibit A

# SUMMONS
## *(CITACION JUDICIAL)*

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

E-FILED
9/24/2020 7:05 PM
Clerk of Court
Superior Court of CA,
County of Santa Clara
20CV370823
Reviewed By: R. Walker
Envelope: 4993527

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

CHUCK ROBBINS, MARK CHANDLER,
Additional Parties Attachment Form is attached.

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

EDWARD SANCHEZ, derivatively on behalf of CISCO SYSTEMS, INC.,

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):*

**CASE NUMBER:** **20CV370823**

Superior Court of California, County of Santa Clara
191 N. First Street, San Jose, California 95113

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*

Francis A. Bottini, Jr., 7817 Ivanhoe Avenue, Suite 102, La Jolla, CA 92037; 858/914-2001

DATE: 9/24/2020 7:05 PM   Clerk of Court   Clerk, by   R. Walker   , Deputy
*(Fecha)*   *(Secretario)*   *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☒ on behalf of *(specify):* CISCO SYSTEMS, INC

   under: ☒ CCP 416.10 (corporation)   ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)   ☐ CCP 416.90 (authorized person)

   ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

| SHORT TITLE: Sanchez v. Robbins, et al. | CASE NUMBER: **20CV370823** |
|---|---|

## INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.
→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party.):*

☐ Plaintiff   ☑ Defendant   ☐ Cross-Complainant   ☐ Cross-Defendant

FRANCINE KATSOUDAS, KELLY A. KRAMER, M. MICHELE BURNS, WESLEY G. BUSH, MICHAEL D. CAPELLAS, MARK GARRETT, DR. KRISTINA M. JOHNSON, RODERICK C. MCGEARY, ARUN SARIN, KBE, BRENTON L. SAUNDERS, DR. LISA SU, DOES 1–30, and CISCO SYSTEMS, INC.

Page ___1___ of ___1___

Page 1 of 1

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| BOTTINI & BOTTINI, INC.<br>Francis A. Bottini, Jr. (SBN 175783)<br>Anne B. Beste (SBN 326881)<br>7817 Ivanhoe Avenue, Suite 102, La Jolla, California 92037<br>TELEPHONE NO.: (858) 914-2001  FAX NO.: (858) 914-2002<br>ATTORNEY FOR *(Name):* Plaintiff, Edward Sanchez | **Electronically Filed<br>by Superior Court of CA,<br>County of Santa Clara,<br>on 9/24/2020 7:05 PM<br>Reviewed By: R. Walker<br>Case #20CV370823<br>Envelope: 4993527** |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF  SANTA CLARA
STREET ADDRESS: 191 N. First Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Jose, CA 95113
BRANCH NAME: Downtown Superior Court

CASE NAME:
Sanchez v. Robbins, et al.

| CIVIL CASE COVER SHEET | | Complex Case Designation | CASE NUMBER: |
|---|---|---|---|
| ✓ **Unlimited**<br>(Amount<br>demanded<br>exceeds $25,000) | ☐ **Limited**<br>(Amount<br>demanded is<br>$25,000 or less) | ☐ **Counter**  ☐ **Joinder**<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | **20CV370823**<br>JUDGE:<br>DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

| Auto Tort | Contract | Provisionally Complex Civil Litigation<br>(Cal. Rules of Court, rules 3.400–3.403) |
|---|---|---|
| ☐ Auto (22) | ☐ Breach of contract/warranty (06) | ☐ Antitrust/Trade regulation (03) |
| ☐ Uninsured motorist (46) | ☐ Rule 3.740 collections (09) | ☐ Construction defect (10) |
| **Other PI/PD/WD (Personal Injury/Property<br>Damage/Wrongful Death) Tort** | ☐ Other collections (09) | ☐ Mass tort (40) |
| ☐ Asbestos (04) | ☐ Insurance coverage (18) | ☐ Securities litigation (28) |
| ☐ Product liability (24) | ☐ Other contract (37) | ☐ Environmental/Toxic tort (30) |
| ☐ Medical malpractice (45) | **Real Property** | ☐ Insurance coverage claims arising from the<br>above listed provisionally complex case<br>types (41) |
| ☐ Other PI/PD/WD (23) | ☐ Eminent domain/Inverse<br>condemnation (14) | |
| **Non-PI/PD/WD (Other) Tort** | ☐ Wrongful eviction (33) | **Enforcement of Judgment** |
| ✓ Business tort/unfair business practice (07) | ☐ Other real property (26) | ☐ Enforcement of judgment (20) |
| ☐ Civil rights (08) | **Unlawful Detainer** | **Miscellaneous Civil Complaint** |
| ☐ Defamation (13) | ☐ Commercial (31) | ☐ RICO (27) |
| ☐ Fraud (16) | ☐ Residential (32) | ☐ Other complaint *(not specified above)* (42) |
| ☐ Intellectual property (19) | ☐ Drugs (38) | **Miscellaneous Civil Petition** |
| ☐ Professional negligence (25) | **Judicial Review** | ☐ Partnership and corporate governance (21) |
| ☐ Other non-PI/PD/WD tort (35) | ☐ Asset forfeiture (05) | ☐ Other petition *(not specified above)* (43) |
| **Employment** | ☐ Petition re: arbitration award (11) | |
| ☐ Wrongful termination (36) | ☐ Writ of mandate (02) | |
| ☐ Other employment (15) | ☐ Other judicial review (39) | |

2. This case ✓ is  ☐ is not  complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ✓ Large number of separately represented parties   d. ✓ Large number of witnesses
   b. ✓ Extensive motion practice raising difficult or novel   e. ✓ Coordination with related actions pending in one or more courts
      issues that will be time-consuming to resolve          in other counties, states, or countries, or in a federal court
   c. ✓ Substantial amount of documentary evidence   f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. ✓ monetary  b. ✓ nonmonetary; declaratory or injunctive relief  c. ✓ punitive
4. Number of causes of action *(specify):* 3; breaches of fiduciary duties and unjust enrichment
5. This case ☐ is  ✓ is not  a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: September 24, 2020

Francis A. Bottini, Jr.
_____
(TYPE OR PRINT NAME)

▶ s/ Francis A. Bottini, Jr.
_____
(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10<br>*www.courtinfo.ca.gov* |
|---|---|---|

# INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

## CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property
   Damage/Wrongful Death
Uninsured Motorist (46) *(if the
   case involves an uninsured
   motorist claim subject to
   arbitration, check this item
   instead of Auto)*

**Other PI/PD/WD (Personal Injury/
Property Damage/Wrongful Death)
Tort**
Asbestos (04)
   Asbestos Property Damage
   Asbestos Personal Injury/
      Wrongful Death
Product Liability *(not asbestos or
   toxic/environmental)* (24)
Medical Malpractice (45)
   Medical Malpractice–
      Physicians & Surgeons
   Other Professional Health Care
      Malpractice
Other PI/PD/WD (23)
   Premises Liability (e.g., slip
      and fall)
   Intentional Bodily Injury/PD/WD
      (e.g., assault, vandalism)
   Intentional Infliction of
      Emotional Distress
   Negligent Infliction of
      Emotional Distress
   Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
   Practice (07)
Civil Rights (e.g., discrimination,
   false arrest) *(not civil
   harassment)* (08)
Defamation (e.g., slander, libel)
   (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
   Legal Malpractice
   Other Professional Malpractice
      *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
   Breach of Rental/Lease
      Contract *(not unlawful detainer
      or wrongful eviction)*
   Contract/Warranty Breach–Seller
      Plaintiff *(not fraud or negligence)*
   Negligent Breach of Contract/
      Warranty
   Other Breach of Contract/Warranty
Collections (e.g., money owed, open
   book accounts) (09)
   Collection Case–Seller Plaintiff
   Other Promissory Note/Collections
      Case
Insurance Coverage *(not provisionally
   complex)* (18)
   Auto Subrogation
   Other Coverage
Other Contract (37)
   Contractual Fraud
   Other Contract Dispute

**Real Property**
Eminent Domain/Inverse
   Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
   Writ of Possession of Real Property
   Mortgage Foreclosure
   Quiet Title
   Other Real Property *(not eminent
      domain, landlord/tenant, or
      foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal
   drugs, check this item; otherwise,
   report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
   Writ–Administrative Mandamus
   Writ–Mandamus on Limited Court
      Case Matter
   Writ–Other Limited Court Case
      Review
Other Judicial Review (39)
   Review of Health Officer Order
   Notice of Appeal–Labor
      Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal.
Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
   *(arising from provisionally complex
   case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
   Abstract of Judgment (Out of
      County)
   Confession of Judgment *(non-
      domestic relations)*
   Sister State Judgment
   Administrative Agency Award
      *(not unpaid taxes)*
   Petition/Certification of Entry of
      Judgment on Unpaid Taxes
   Other Enforcement of Judgment
      Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified
   above)* (42)
   Declaratory Relief Only
   Injunctive Relief Only *(non-
      harassment)*
   Mechanics Lien
   Other Commercial Complaint
      Case *(non-tort/non-complex)*
   Other Civil Complaint
      *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate
   Governance (21)
Other Petition *(not specified
   above)* (43)
   Civil Harassment
   Workplace Violence
   Elder/Dependent Adult
      Abuse
   Election Contest
   Petition for Name Change
   Petition for Relief From Late
      Claim
   Other Civil Petition

**CIVIL CASE COVER SHEET**

1    BOTTINI & BOTTINI, INC.
     Francis A. Bottini, Jr. (SBN 175783)
2    Anne B. Beste (SBN 326881)
     Albert Y. Chang (SBN 296065)
3    Yury A. Kolesnikov (SBN 271173)
     7817 Ivanhoe Avenue, Suite 102
4    La Jolla, California 92037
     Telephone:    (858) 914-2001
5    Facsimile:    (858) 914-2002

6    *Attorneys for Plaintiff Edward Sanchez*

7            SUPERIOR COURT OF THE STATE OF CALIFORNIA

8                    COUNTY OF SANTA CLARA

9    EDWARD SANCHEZ, derivatively on      Case No. **20CV370823**
     behalf of CISCO SYSTEMS, INC.,
10                                        **SHAREHOLDER DERIVATIVE**
                          Plaintiff,      **COMPLAINT FOR:**
11
               vs.                         1. **BREACH OF FIDUCIARY DUTY,**
12                                         2. **AIDING AND ABETTING**
     CHUCK ROBBINS, MARK CHANDLER,            **BREACH OF FIDUCIARY DUTY,**
13   FRANCINE KATSOUDAS, KELLY A.             **and**
     KRAMER, M. MICHELE BURNS,
14   WESLEY G. BUSH, MICHAEL D.            3. **UNJUST ENRICHMENT**
     CAPELLAS, MARK GARRETT, DR.
15   KRISTINA M. JOHNSON, RODERICK C.     **DEMAND FOR JURY TRIAL**
     MCGEARY, ARUN SARIN, KBE,
16   BRENTON L. SAUNDERS, DR. LISA SU,
     and DOES 1–30,
17
                          Defendants,
18
               – and –
19
     CISCO SYSTEMS, INC.,
20
                          Nominal Defendant.
21

22

23

24

25

26

27

28

SHAREHOLDER DERIVATIVE COMPLAINT

# Table of Contents

I. INTRODUCTION ...................................................................................2

II. NATURE AND SUMMARY OF THE ACTION ....................................6

    A. Ouster of Female Co-Founder Lerner .......................................7

    B. All White Male CEOs .................................................................8

III. JURISDICTION AND VENUE .............................................................15

IV. THE PARTIES......................................................................................16

    A. Plaintiff .....................................................................................16

    B. Nominal Defendant ..................................................................16

    C. Executive Officer Defendants...................................................16

    D. Director Defendants..................................................................18

    E. Doe Defendants ........................................................................20

    F. Unnamed Participants................................................................20

V. RESPONSIBILITIES AND DUTIES OF THE INDIVIDUAL DEFENDANTS........21

    A. Responsibilities of the Individual Defendants................................21

    B. Fiduciary Duties of the Individual Defendants.................................23

    C. Breaches of Fiduciary Duties by Individual Defendants ..............24

    D. Conspiracy, Aiding and Abetting, and Concerted Action.............24

    E. The Directors' Roles and Committees at Cisco...............................26

VI. SUBSTANTIVE ALLEGATIONS.........................................................26

    A. At All Relevant Times, the Individual Defendants Have Had Actual Knowledge that Cisco has Repeatedly Violated Anti-Discrimination Laws, and That Cisco Has Failed to Comply with Its Own Policies of Promoting Diversity and Prohibiting Discrimination, Yet the Individual Defendants Have Continued to Refuse to Nominate Black Individuals and Minorities to the Board.............................................27

2

B.     The Director Defendants Breached Their Fiduciary Duty of Candor by Causing Cisco to Include False and Misleading Statements in Cisco's Proxy Statements .................................................................. 29

C.     Cisco's Nominating and Corporate Governance Committee Members Have Repeatedly Breached Their Fiduciary Duties to Ensure Diversity on the Board ......................................................... 40

D.     The Director Defendants Breached Their Duties of Loyalty and Good Faith by Failing to Ensure the Company's Compliance with Federal and State Laws Regarding Diversity and Anti-Discrimination ................................................................................. 43

E.     The Board Has Breached Its Duties by Failing to Ensure an Independent Chairman ....................................................................... 44

F.     The Director Defendants Have Breached Their Duties by Continually Re-Hiring PricewaterhouseCoopers LLP as the Company's Auditor ......................................................................... 44

G.     The Unjust Compensation Awarded to the Individual Defendants ........... 47

VII.     THE COMPANY HAS SUFFERED SIGNIFICANT DAMAGES ............................ 50

VIII.     DEMAND FUTILITY ................................................................................ 51

IX.     CAUSES OF ACTION ............................................................................. 58

X.     PRAYER FOR RELIEF ............................................................................ 60

3

Plaintiff Edward Sanchez ("Plaintiff") submits this Shareholder Derivative Complaint against certain directors and officers of nominal defendant Cisco Systems, Inc., ("Cisco" or the "Company") for, *inter alia*, breaches of fiduciary duties, and unjust enrichment. In support of these claims, Plaintiff alleges the following upon (1) personal knowledge with respect to the matters pertaining to himself; and (2) information and belief with respect to all other matters, based upon the investigations undertaken by his counsel, which include Cisco's legal filings, regulatory filings, press releases, analyst reports, and media reports about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth below after a reasonable opportunity for discovery.

## I.    INTRODUCTION

*Today we're the most diverse Cisco since 1998. This is due in large part to diversity and inclusion starting at the top.*

*See* Cisco's December 13, 2018 blog on diversity.[1]

1.    Despite this platitude, repeated in its 2019 Corporate Social Responsibility Report[2], Cisco has failed to create any meaningful racial and ethnic diversity at the very top of the Company — the Board of Directors (the "Board"), the CEO, and the Executive Leadership Team ("ELT").

2.    The Cisco Board has lacked racial and ethnic diversity at all relevant times, and is one of the few remaining publicly-traded companies without a single African

---

[1] *See* https://blogs.cisco.com/diversity/between-where-we-stand-today-and-where-we-go-from-here-theres-a-bridge, December 13, 2018.

[2] *See* https://www.cisco.com/c/dam/m/en_us/about/csr/csr-report/2019/_pdf/csr-report-2019.pdf, asserting, e.g., "We are the most diverse Cisco since we began tracking our diversity in 1998," at 38, and "Our culture sets us apart, starting at the top with our diverse Executive Leadership Team (ELT)" at 39.

SHAREHOLDER DERIVATIVE COMPLAINT

American director. The following are the current members of the Board:



M. Michele Burns

Wesley G. Bush

Michael D. Capellas

Mark Garrett

Dr. Kristina M. Johnson

Roderick C. McGeary

Chuck Robbins

Arun Sarin, KBE

Brenton L. Saunders

3

**Dr. Lisa Su**



3. The Cisco ELT has lacked meaningful racial and ethnic diversity at all relevant times, and is one of the few remaining publicly-traded companies without a single African American executive leader. The following are the current members of the ELT and Cisco's Executive Officers:

**Chuck Robbins**
CEO & Chairman of the Board

**Liz Centoni**
Senior Vice President, Strategy, Emerging Technologies & Incubation

**Mark Chandler**
Executive Vice President, Chief Legal Officer, & Chief Compliance Officer

  

4



**Amy Chang**
Executive Vice President

**Eyal Dagan**
Senior Vice President of the
Common Hardware Group

**Jonathan Davidson**
Senior Vice President &
General Manager of Cisco's

**Gerri Elliott**
Executive Vice President,
Chief Sales & Marketing
Officer

**Francine Katsoudas**
Executive Vice President
and Chief People Officer

**Kelly A. Kramer**
Executive Vice President &
CFO

**Stella Low**
Chief Communications
Officer

**Maria Martinez**
Executive Vice President &
Chief Customer Experience
Officer

**Todd Nightingale**
Senior Vice President &
General Manager of
Enterprise Networking &
Cloud

5

| **Jeetu Patel**<br>Senior Vice President &<br>General Manager of<br>Security & Applications | **Mark Patterson**<br>Senior Vice Presideny,<br>Chief of Staff to the Office<br>of the Chairman & CEO | **Irving Tan**<br>Executive Vice President &<br>Chief of Operations |
| --- | --- | --- |
|  |  |  |

**Michael D. Timmeny**
Senior Vice President, Chief
Government Strategy
Officer



## II.    NATURE AND SUMMARY OF THE ACTION

4.    Cisco's persistent and pervasive lack of diversity has its roots in early actions that set the tone of intolerance at the Company. These actions began with the ouster of the female co-founder of the Company, continues through the Company's all-white male CEOs, is reinforced by a lack of racial and ethnic diversity at the Board level, extends through a lack of racial and ethnic diversity at the executive leadership level, and permeates the ranks of employees, particularly higher-paid technical employees.

5.    Moreover, with respect to the small amount of diversity in its workforce, far from being valued for their unique backgrounds and perspectives, Cisco's diverse employees are regarded as inferior, undervalued, unworthy of mentoring or promotion, and frequently held out as the paradigmatic example of their category of diversity,

6

whether they wish to serve as a role model or not. It is not surprising that Cisco has trouble integrating its diverse employees into the Company, not to mention retaining them as employees at all.

6.    As author Liz Fosslien notes, "Diversity is having a seat at the table. Inclusion is having a voice. And belonging is having that voice be heard."

7.    Discussion of race and racism remains challenging, and sometimes difficult to address directly, even in 2020. And directors of public companies are not immune from these difficulties, particularly where, as here, it is their public statements about diversity, and personal efforts to achieve diverse leadership, that have provoked the inquiry into the falsity of their publicly stated diversity objectives.

**A.    Ouster of Female Co-Founder Lerner**

8.    Promisingly, Cisco was co-founded in December 1984 by a woman, Sandy Lerner ("Lerner"), who counted a master's degree in statistics and computer science from Stanford University among her many accomplishments.

9.    Lerner holds the distinct honor of being one of only two female co-founders of any of the currently listed Fortune 500 companies, with Cisco listed in 2020 as number 63 in the rankings.[3] Cisco has been listed as a Fortune 500 company since its debut at number 332 on the list in 1997.[4]

10.    Little more than five and a half years after her founding of Cisco, and three years after Cisco debuted on the Fortune 500 list, in August 1990, Lerner was fired from Cisco by its then CEO, John Morgridge, at the urging of seven white male vice presidents. This firing ushered in an era of white-male domination of the Company that

---

[3] Estee Lauder, the other female co-founded company, is ranked 215 on the 2020 Fortune 500 list.

[4] Fortune 500 company rankings for 1997, at https://fortune.com/fortune500/1997/search/?hqState=CA.

SHAREHOLDER DERIVATIVE COMPLAINT

1  remains largely intact today.

2  **B.    All White Male CEOs**

3      11.    In its roughly 36-year history, Cisco has had five CEOs, including an early

4  months-long interim CEO in 1988.[5]  All five CEOs were and are male, and all five CEOs

5  were and are white.  The Cisco traits that start "at the top" were, are, and continue to be,

6  whiteness and maleness.

7      12.    In 2015, Chuck Robbins, a then 15-year veteran worker for Cisco, became

8  its 5th white, male CEO.  He came up through Cisco's ranks and holds a bachelor's

9  degree from the University of North Carolina. In 2017, Chuck Robbins boldly but

10 misleadingly asserted that Cisco had a high concentration of both female and minority

11 leaders, with diversity at the leadership level and diversity in the boardroom. "I think

12 we have been a leader in advocating for an inclusive environment and a diverse

13 workforce," Robbins said. "Honestly, it's just good business, but for us it just happened

14 naturally that the best people for those roles [also matched] what we were looking for on

15 our board ... and that's the way it ought to be." *See* 2017 Robbins Interview with The

16 Street.[6]

17     13.    According to the somewhat trite but still relevant adage, actions speak

18 louder than words.  *Cisco's proxy materials and Corporate Social Responsibility*

19 *Reports going back to at least 2012 demonstrate that there have been no African-*

20 *Americans, no Hispanics, no American Indians, no Alaska Natives, no native*

21 *Hawaiians and no Pacific Islanders on the Board.*  Currently, and for at least the past

22

23      [5] William Graves, 1987-1988; interim CEO, 1988; John Morgridge, 1988-1995; John Chambers, 1995-2015; Chuck Robbins, 2015-present.

24      [6] "Cisco's Chuck Robbins Says Tech's Diversity Problem 'Should Be a Nonissue,'" THE STREET, by Annie Palmer, Aug. 21, 2017.

25 https://www.thestreet.com/investing/stocks/cisco-s-chuck-robbins-says-tech-s-diversity-problem-should-be-a-nonissue-14277237.

26

27

28

8

1  eight years, the only non-female ethnic minority serving on the Board is Arun Sarin. Mr.

2  Sarin, born in India, is listed as Asian and is an honorary Knight of the British Empire.

3       14.    Cisco states in its 2019 Corporate Social Responsibility Report that "[w]e

4  are the most diverse Cisco since we began tracking our diversity in 1998." Among

5  Cisco's Board and Executive Officers, however, diversity is conspicuously absent.

6       15.    Cisco's Board, which has no Black individuals, has consciously failed to

7  carry out Cisco's written proclamations about increasing full-spectrum diversity in its

8  own ranks. *The Board, as well as the Company's Executive Leadership team, remain*

9  *devoid of Black people and significant other minorities.* Instead, Cisco lumps race and

10 ethnicity with gender in its diversity statistics, misleadingly labeling the presence of

11 women on the Board as "full-spectrum" diversity. A sign advising applicants "Blacks

12 Need Not Apply" might as well hang at the entrance to the Company's headquarters at

13 170 W. Tasman Drive in San Jose, California.

14      16.    The Company also is still today, in 2020, dominated by males, with *74% of*

15 *its global workforce consisting of males and 79% of its Vice Presidents consisting of*

16 *males and just 21% female. African Americans make up just 3.8% of Cisco's U.S.*

17 *workforce, and there are no Blacks on the Board or among the Company's Executive*

18 *Leadership team.*

19      17.    Simply put, Cisco's Directors have deceived stockholders and the market

20 by repeatedly lying about the Company's commitment to racial and ethnic diversity. In

21 doing so, the Directors have breached their duty of candor and have also violated the

22 federal proxy laws. Their conduct has also irreparably harmed Cisco. For those who

23 care about diversity, inclusion, and honesty, those who do not adhere to these principles

24 should be boycotted, especially if the perpetrator is one of the largest and most

25 influential corporations in Silicon Valley.

26      18.    Every business entity — whether publicly traded or not — has certain legal

27 obligations and responsibilities to its shareholders, customers, investors, and the public.

28

9

These responsibilities include the obligation to be truthful and honest; to actually implement the policies and procedures that it represents it has adopted; and to not engage in racial discrimination, whether it is in its workforce or leadership positions. Cisco has failed on these counts.

19. Moreover, a company's statements about Board diversity are highly material to investors.[7] In the 2016 edition of its governance principles, the Business Roundtable, an influential association of chief executives of American companies, strongly endorsed a link between racial and ethnic diversity in boards and board effectiveness and the creation of long-term shareholder value. In doing so, the association made the first substantive "business case" for ethnic and gender diversity.[8] By correlating diverse boards with greater board effectiveness and the promotion of long-term value creation, the Business Roundtable's recommendation transcends public policy debates and moral imperatives. It is the most prominent acknowledgment of diversity as a governance principle, and a standard that nominating committees are advised to adopt. It does not retreat from principles of competency-based governance as much as it recasts concepts of competency in a more inclusive manner — one that attributes new value to skills, experience and expertise that is reflective of the broader range of society.[9]

///

---

[7] *See* Arleen Jacobius, "Calpers Turns Focus to Board Diversity in Proxy Voting," PENSIONS & INVESTMENTS, Sept. 17, 2018 (in 2018, Calpers voted against 438 directors at 141 different companies based on the companies' failure to respond to Calpers' efforts to increase board diversity).

[8] *See* Michael W. Peregrine, "Corporate Board Diversity Gets Push From Business Leaders," NEW YORK TIMES, Oct. 12, 2016, available at https://www.nytimes.com/2016/10/14/business/dealbook/corporate-board-diversity-gets-push-from-business-leaders.html?searchResultPosition=1, last visited Sept. 16, 2020.

[9] *Id.*

SHAREHOLDER DERIVATIVE COMPLAINT

20. Founded in 1984, Cisco's Board today in 2020 has no African-Americans, no Latinos, and no other racial or ethnic minority save Asian-Americans; and Cisco's self-published statistics dating back to at least 2015 demonstrate the same lack of diversity. And, no diverse appointments are in the offing. Significantly, while Cisco's Robbins was asserting that Cisco was "driving diversity and inclusion *throughout* our *entire* organization," *see* Cisco 2019 CSR Report at 3 (emphasis supplied), even the female gender representation at the Board level declined from 33 percent (2017) to 27 percent (2018) to 20 percent (2019).

21. Cisco's ELT today in 2020 has no African-Americans; and Cisco's self-published statistics dating back to at least 2015 demonstrate the same lack of diversity. Yet, Cisco consistently groups gender and diversity statistics in a way that misleads investors and the public into believing Cisco has achieved greater diversity at the Board and ELT levels than it has. *See* Cisco 2019 Annual Report, at 7.

22. This lawsuit is about deception and a lack of truthfulness and effort on the part of the Board to fulfill their fiduciary duties which have resulted in racial discrimination in its leadership positions and have otherwise worked to the detriment of the Cisco shareholders.

23. As recently as March 2020, Cisco agreed to pay $2,000,000 in lost wages and interest to affected employees, and pay an additional $2,750,000 over the next five years in pay-equity adjustments to its employees due to a Department of Labor ("DOL") claim that *"the company paid women, black and Hispanic employees less than comparable male and white employees in similar positions." See March 16, 2020 DOL News Release*. Statistics don't lie, and Cisco's Board and ELT reveal one of the lowest prevalence of Black individuals in Silicon Valley.

24. Platitudes in proxy statements and Corporate Sustainability Reports are not progress. Simply put, Cisco has no *real* commitment to diversity and its Board is turning a blind eye to the Company's failure to ensure the "diversity" trumpeted by the

11

Directors in Cisco's public statements and filings with the Securities and Exchange Commission ("SEC") and its annual proxy reports to shareholders.

25. The Director Defendants named herein all signed each of Cisco's annual proxy statements. With such signatures come an obligation to ensure that the statements in the Proxy were true and accurate, and to correct any misleading statements. They failed to do so.

26. As demonstrated herein, the Defendants knew of, but failed to disclose, unlawful business practices at Cisco that put the Company at material risk — namely, discriminatory hiring and compensation practices. Had this information been disclosed, shareholders would not have voted to re-elect Board members, approve executive compensation packages, and reject an independent board chairman.

27. The time for change has come. If Cisco's directors want to continue to be part of the problem, not the solution, then they at least need to be held liable for their breaches of fiduciary duty to the Company's stockholders. If, on the other hand, they want to be part of real change, they hold the keys themselves. They can (and should), stand up and exercise the control of Cisco that they possess to make change NOW.

28. The shareholder derivative lawsuit has been the only judicial mechanism for shareholders to hold directors accountable for engaging in wrongdoing. Like the United State Supreme Court, California courts have long recognized that derivative suits play an important role in corporate governance where directors fail to do their jobs:

> The derivative action is practically the only remedy for calling the management to account for its wrongs against the corporation and to obtain restitution. Where a derivative suit is against outsiders for wrongs against the corporation the directors can usually be expected to decide impartially on the advisability of suing. But the management cannot be expected to sue themselves for their own misdeeds.

*Pearce v. Super. Ct.*, 149 Cal. App. 3d 1058, 1065 (1983); *see also Vega v. Jones, Day, Reavis & Pogue,* 121 Cal. App. 4th 282, 297 (2004); *accord Kamen v. Kemper Fin. Servs.*, 500 U.S. 90, 95 (1991) (quoting *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 548 (1949)). As the California Supreme Court recognized in *Jones v. H. F. Ahmanson & Co.*, where, as here,

12

the company's board and management fail to perform their duties, stockholders have a "right" to bring derivative actions. *See* 1 Cal. 3d 93, 107 (1969). The courts of Delaware, Cisco's state of incorporation, likewise acknowledge that derivative actions serve an important function: "The machinery of corporate democracy and the derivative suit are potent tools to redress the conduct of a torpid or unfaithful management." *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984), *overruled in part on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

29.     Plaintiff, derivatively on behalf of Cisco, seeks the following relief from the Director Defendants:

(a)     At least three of Cisco's directors should immediately resign prior to the Company's annual meeting which is scheduled for November 2020 and should insist that the Company nominate three new persons to serve in their stead, which applicants should include two Black persons and one other minority;

(b)     All Director Defendants named in this suit should return all their 2020 compensation received from Cisco (including any stock grants), and donate the money to an acceptable charity or organization whose efforts include the advancement of Black people and minorities in corporate America;

(c)     Cisco should agree to add more particularized information in its annual CSR Report about the hiring, advancement, promotion, and pay equity of all minorities at Cisco;

(d)     Cisco should replace Chuck Robbins as executive Chairman of the Board; Robbins is not independent, and the lack of a truly independent Chairman at Cisco has been a big part of the reason Cisco has not sufficiently made any real progress at achieving diversity.

(e)     Cisco should create a $775 million fund to hire Black individuals and other minorities, promote minorities to more management positions at the Company, establish and maintain a mentorship program at Cisco for minorities

that is committed to providing the skills and mentorship necessary to succeed in corporate America;

(f)     Cisco should require annual training of its entire Board and all Section 16 executive officers, including the ELT, which training should at a minimum focus on diversity, affirmative action, anti-discrimination and anti-harassment, and other relevant topics.

(g)     Cisco should immediately set specific goals with respect to the number of Black individuals and minorities to hire at the Company over the next five years, and Cisco should adopt a revised executive compensation program that makes 30% of executives' compensation tied to the achievement of the diversity goals.

(h)     Cisco should replace PricewaterhouseCoopers LLP ("PwC") as its auditor.  Cisco is one of PwC's largest customers, listed in 2020 as PwC's 22nd largest client by audit revenues alone.[10]  PwC (and its pre-merger predecessor Coopers & Lybrand L.L.P.) has served as Cisco's auditor *since 1988*,[11] giving rise to a cozy and clubby relationship between PwC and Cisco which is not conducive to effective auditing.   The Company's compliance with its stated policies concerning the alleged commitment to racial and ethnic diversity at the Board and ELT have been abysmal to the point of being basically non-existent.   The very purpose of an auditor is to assess the Company's internal controls and determine if they are functioning effectively.  Rather than doing so, PwC has wrongfully and consistently given Cisco's internal controls a clean bill of health and has failed to

---

[10] *See* https://big4accountingfirms.com/pwc-audit-clients-list/.

[11] 2019 Proxy Statement, at 57, states: "PwC has audited Cisco's consolidated financial statements annually since fiscal 1988."

14

point out the obvious — that Cisco lacks an effective system of internal controls to ensure that the Company is not discriminating against minorities and is complying with its stated goals and initiatives regarding the promotion of diversity and the avoidance of discrimination at the top levels.

30.     The Individual Defendants' misconduct has caused severe financial and reputational damage to Cisco.  The DOL claims which alleged pay discrimination against women and minorities resulted in a payout of almost $5,000,000.

31.     While systematically underpaying minorities and women, Cisco's CEO has used the money saved to pay himself outsized amounts.  Defendant Robbins is ranked 26th on a 2019 list of the 100 highest paid CEOs. He made $21.3 million in compensation in one year — *more than two hundred times greater than the average worker's salary.*[12]

32.     As set forth below, Defendants' conduct constitutes bad faith and disloyal acts, giving rise to claims that fall outside the scope of the business judgment rule and outside of permissible indemnification by Cisco.  As a result, all members of the Board face a substantial likelihood of liability and any demand on them to bring this case would be a futile and useless act.

## III.     JURISDICTION AND VENUE

33.     This Court has jurisdiction because the Defendants conduct business in California, including, but not limited to, the conduct here at issue, and because they have sufficient minimum contacts with California to render the exercise of jurisdiction by the

---

[12] Michael B. Sauter, "These are the highest-paid CEOs at America's largest companies," USA TODAY, April 30, 2019. https://www.usatoday.com/story/money/2019/04/30/highest-paid-ceos-at-americas-largest-companies-tim-cook-robert-iger/39389897/; "Average Salary for Cisco Systems, Inc. Employees," https://www.payscale.com/research/US/Employer=Cisco_Systems_Inc/Salary#:~:text=Cisco%20Systems%20Inc%20employees%20with%20the%20job%20title,the%20title%20Network%20Administrator%20make%20the%20least%20.

SHAREHOLDER DERIVATIVE COMPLAINT

California courts permissible under traditional notions of fair play and substantial justice. The Court has jurisdiction over Cisco because Cisco is headquartered in San Jose, California and has substantial business operations in California.

34. Venue is proper in this Court because the conduct at issue took place and has effect in this County. The Company's headquarters and principal place of business are located at 170 W. Tasman Drive, San Jose, California 95134.

## IV. THE PARTIES

### A. Plaintiff

35. Plaintiff Edward Sanchez is a current shareholder of Cisco, and has continuously held Cisco stock at all relevant times. Plaintiff is a resident and citizen of California.

### B. Nominal Defendant

36. Cisco Systems, Inc. is a California corporation with its headquarters at 170 W. Tasman Drive, San Jose, California 95134, in the center of Silicon Valley. Cisco is an American multinational technology conglomerate that develops, manufactures and sells networking hardware, software, telecommunications equipment and other high-technology services and products. Through its numerous subsidiaries, such as OpenDNS, Webex, Jabber and Jasper, Cisco specializes in specific tech markets, such as the Internet of Things (IoT), domain security and energy management. Cisco is a California corporation and citizen of California.

### C. Executive Officer Defendants

37. Defendant Chuck Robbins is the Chairman and CEO of Cisco. Robbins has been a member of the Board of Cisco Systems, Inc. since May 2015, has served as its chairman since December 2017, and has been CEO since July 2015. He joined the Company in 1997 and held various managerial positions in sales until being elevated to the position of Vice President in 2002. He is a member of the board of directors of BlackRock, Inc., which is the Company's second largest shareholder, owning 323,233,397

16

shares, or 7.6% of all outstanding shares. Robbins lives in Los Gatos, which is part of Santa Clara County.

38. Defendant Mark Chandler is an Executive Vice President, Chief Legal Officer, and is also Cisco's Chief Compliance Officer. In these roles, he oversees Cisco's global legal activities and policies, as well as ethics, compliance and regulatory affairs, employee relations, investigations, and brand protection. He has been General Counsel since 2001. Chandler lived in San Francisco, California.

39. Defendant Francine Katsoudas is Executive Vice President and Chief People Officer of Cisco. She plays a major role in the Company's overall performance, leading organizational strategy, promoting operational effectiveness, and ensuring team performance. As Cisco's Chief People Officer, Katsoudas is responsible for diversity and inclusion efforts at the Company. Katsoudas has filled various leadership roles at Cisco for over 20 years. She lives in Los Gatos, which is part of Santa Clara County.

40. Defendant Kelly A. Kramer is Executive Vice President and Chief Financial Officer (CFO) at Cisco, managing financial strategy, and overseeing all financial functions, corporate development, mergers, acquisitions, integrations and investor relations for the Company with total revenue for fiscal year 2019 of $51.7 billion and more than 76,000 employees. Before being named CFO in 2015, Kramer was Senior Vice President of Business Technology and Operations Finance, partnering with the Development organization across business groups, segments, and operations on strategic long-range planning, budgeting, and forecasting new-offer development, as well as the analysis and strategy of product pricing. In addition, her organization managed finance for the company's supply chain, marketing, corporate communications, operations, HR, and IT groups. Kramer joined Cisco in 2012 as Senior Vice President of Corporate Finance. She lives in Half Moon Bay, California.

///

17

**D. Director Defendants**

41. Defendant M. Michele Burns has been a member of the Cisco Board during all relevant times, and began her tenure on the Board in 2003. Burns was working as the CFO for Delta Airlines, Inc. when she was appointed to the Cisco Board. She currently serves on the Audit Committee and is the chair of the Finance Committee.

42. Defendant Wesley G. Bush joined the Cisco Board in May 2019. Prior to that, Bush served as the CEO of Northrop Grumman Corp. ("Northrop") from 2010 through 2018 and was the chairman of the board of Northrop from 2011 through 2019. He currently serves on the Compensation and Management Development Committee and the Finance Committee.

43. Defendant Michael D. Capellas was a member of the Cisco Board during all relevant times and joined the Board in 2006. Capellas has served as founder and CEO of Capellas Strategic Partners ("CSP") since 2012. Capellas has served as President or CEO for various large corporations before forming CSP. He serves as the Chair of both the Acquisition Committee and the Nomination and Governance Committee.

44. Defendant Mark Garrett was a member of the Cisco Board during all relevant times. He has been a member of the Board since April 2018. Garrett served as Executive Vice President and Chief Financial Officer of Adobe Systems Incorporated from February 2007 to April 2018. From January 2004 to February 2007, Garrett served as Senior Vice President and Chief Financial Officer of the Software Group of EMC Corporation. From August 2002 to January 2004 and from 1997 to 1999, Mr. Garrett served as Executive Vice President and Chief Financial Officer of Documentum, Inc., including throughout its acquisition by EMC in December 2003.

45. Defendant Dr. Kristina M. Johnson was a member of the Cisco Board during all relevant times. She has been a member of the Board since August 2012. Dr. Johnson has served as the chancellor of the State University of New York since September 2017. From January 2014 to September 2017, Dr. Johnson served as the Chief Executive Officer of Cube Hydro Partners, LLC, a clean energy company, and a joint

18

venture between Enduring Hydro, a company she founded in January 2011 and I Squared Capital, a private equity firm.

46. Defendant Roderick C. McGeary was a member of the Cisco Board during all relevant times. He has been a member of the Board since July 2003. He served as Chairman of Tegile Systems, Inc. from June 2010 to June 2012. From November 2004 to December 2009, he served as Chairman of the Board of BearingPoint, Inc. and also was interim Chief Executive Officer of BearingPoint from November 2004 to March 2005. McGeary currently serves on the boards of directors of PACCAR Inc. and Raymond James Financial, Inc.

47. Defendant Arun Sarin, KBE was a member of the Cisco Board during all relevant times. He has been a member of the Board since September 2009 and previously served on the Board from September 1998 to July 2003. In April 2003, he became CEO designate of Vodafone Group Plc and served as its Chief Executive Officer from July 2003 to July 2008. Sarin also served as a member of the board of directors of that company from 1999 to 2008. From July 2001 to January 2003, he was Chief Executive Officer of Accel-KKR Telecom. He was the Chief Executive Officer of InfoSpace, Inc., and a member of its board of directors from April 2000 to January 2001. He currently serves on the boards of directors of Accenture plc, Cerence Inc. and The Charles Schwab Corporation.

48. Defendant Brenton L. Saunders was a member of the Cisco Board during all relevant times. He has been a member of the Board since March 2017. Saunders has served as CEO and President of Allergan plc since July 2014. He has been a board member of Allergan plc since July 2014 and has served as its Chairman since October 2016. Saunders previously served as Chief Executive Officer and President of Forest Laboratories, Inc. from October 2013 until July 2014 and had served as a board member of Forest Laboratories, Inc. beginning in 2011.

///

19

49.     Defendant Dr. Lisa Su was a member of the Cisco Board during all relevant times.  She has been a member of the Board since January 2020. Dr. Su joined AMD in 2012 and has held the position of President and Chief Executive Officer since October 2014. She also serves on AMD's Board of Directors. Previously, Dr. Su served as Senior Vice President and General Manager, Networking and Multimedia at Freescale Semiconductor, Inc., and was responsible for global strategy, marketing and engineering for the company's embedded communications and applications processor business.

50.     The defendants identified in paragraphs 37 through 40 are referred to herein as the "Executive Officer Defendants."  The Defendants identified in paragraphs 41 through 49 are referred to herein as the "Director Defendants."  Collectively, all defendants are referred to herein as the "Individual Defendants."

**E.    Doe Defendants**

51.     Except as described herein, Plaintiff is ignorant of the true names of defendants sued as Does 1 through 30, inclusive, under California Code of Civil Procedure section 474 and, therefore, Plaintiff sues these defendants by such fictitious names.  Following further investigation and discovery, Plaintiff will seek leave of this Court to amend this Complaint to allege their true names and capacities when ascertained.  These fictitiously named defendants are Cisco officers, other members of management, employees, and/or consultants or third parties who were involved in the wrongdoing detailed herein.  These defendants aided and abetted, and participated with and/or conspired with the named defendants in the wrongful acts and course of conduct or otherwise caused the damages and injuries claimed herein and are responsible in some manner for the acts, occurrences, and events alleged in this Complaint.

**F.    Unnamed Participants**

52.     Numerous individuals and entities participated actively during the course of and in furtherance of the wrongdoing described herein.  The individuals and entities acted in concert by joint ventures and by acting as agents for principals, to advance the

20

objectives of the scheme and to provide the scheme to benefit defendants and themselves to the detriment of Cisco.

## V.    RESPONSIBILITIES AND DUTIES OF THE INDIVIDUAL DEFENDANTS

### A.    Responsibilities of the Individual Defendants

53.    Corporate officers and directors owe the highest fiduciary duties of care and loyalty to the corporation they serve.

54.    Board Members and Executive Officers are held to the highest level of ethics and compliance with the law.

55.    The Company's Code of Business Conduct ("COBC") states that "[t]he COBC applies to all Cisco employees, subsidiaries, and members of our Board of Directors."

56.    The Company's Code of Business Conduct ("COBC") states that:

> We do not discriminate. We are proud of our global workforce. In all of our employment processes — recruiting, hiring, developing, and promoting employees — decisions are made without regard to gender, race, color, national origin, ancestry, citizenship, religion, age, physical or mental ability, medical condition, genetic information, pregnancy, sexual orientation, gender identity or gender expression, veteran status, or marital status, or any other basis protected by law.

57.    The Company's COBC also states that:

> Corporate Social Responsibility is integrated into our business strategy and functions. It's core to our purpose, our culture, and how we invest our resources. We focus on issues most relevant to our business and where we believe we can have the greatest impact. From our culture of integrity and inclusion, our strategic investments in building skills for the jobs of the future, and the way we manage and support our global supply chain, to how we operate in support of environmental sustainability, our CSR and business strategies are tightly integrated.

58.    The Board obviously knew that it was white and lacked racial and ethnic, or non-gender, diversity. The Board and the Executive Officers also knew that racial and ethnic diversity was lacking in the Company's ELT and, to a lesser extent, the overall workforce. The Defendants' knowledge of the problem is reflected by their efforts to conceal the lack of racial and ethnic diversity by presenting combined gender and

21

ethnicity statistics.

59.     The Board is responsible for oversight and compliance with the Company's internal controls regarding diversity, anti-discrimination, pay equity, hiring and promotion.   As alleged herein, the Company's Board failed to act in good faith by failing to ensure compliance with these policies and controls, which existed on paper, but were knowingly disregarded.

60.     Cisco's 2019 Proxy statement asserts that:

> The Board of Directors, acting directly and through its committees, is responsible for the oversight of Cisco's risk management. With the oversight of the Board of Directors, Cisco has implemented practices, processes and programs designed to help manage the risks to which we are exposed in our business and to align risk-taking appropriately with our efforts to increase shareholder value.

61.     The most glaring and recent evidence of the Board's lack of meaningful oversight of racial and ethnic discrimination in pay and treatment is highlighted in a recently filed government lawsuit ("the Caste Discrimination Lawsuit"):

> "California regulators sued Cisco Systems Inc on Tuesday [June 30, 2020], accusing it of discriminating against an Indian-American employee and allowing him to be harassed by two managers because he was from a lower Indian caste than them. ... That caste hierarchy was enforced in the workplace, according to the lawsuit, which accuses the two former engineering managers of harassment. ... At Cisco, the unnamed employee reported his manager to human resources in November 2016 for outing his caste to colleagues. The manager allegedly retaliated, but Cisco determined caste discrimination was not illegal and issues continued through 2018, the lawsuit states. Cisco reassigned the employee's duties and isolated him from colleagues, rejected a raise and opportunities that would have led to one and denied him two promotions, according to the lawsuit."[13]

62.     The Board knew the Company had policies in place on paper, but they failed to give the policies any teeth or enforcement.   The Board's conduct represented

---

[13] "California Accuses Cisco of Job Discrimination Based on Indian Employee's Caste," REUTERS, July 1, 2020; https://www.news18.com/news/world/california-accuses-cisco-of-job-discrimination-based-on-indian-employees-caste-2695123.html.

SHAREHOLDER DERIVATIVE COMPLAINT

hypocrisy, bad faith, and disloyal conduct. The Board had a duty to cause the Company to comply with the law and its own Code of Ethics and Business Conduct, and failed to do so.

63. The direct involvement of Cisco's Board makes them interested in the outcome of this litigation because they face a substantial likelihood of liability. Demand is thus futile.

## B. Fiduciary Duties of the Individual Defendants

64. By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and continue to owe Cisco and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Cisco in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Cisco and not in furtherance of their personal interest or benefit.

65. To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company. By virtue of such duties, the officers and directors of Cisco were required to, among other things:

(a) conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

(b) remain informed as to how Cisco conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to

23

comply with applicable laws.

### C. Breaches of Fiduciary Duties by Individual Defendants

66. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Cisco, the absence of good faith on their part, and a reckless disregard for their duties to the Company.

67. The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to cover up Cisco's discrimination, and caused Cisco to incur substantial damage.

68. The Individual Defendants, because of their positions of control and authority as officers and/or directors of Cisco, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such improper actions. As a result, and in addition to the damage the Company has already incurred, Cisco has expended, and will continue to expend, significant sums of money.

### D. Conspiracy, Aiding and Abetting, and Concerted Action

69. At all relevant times, Individual Defendants were agents of the remaining Individual Defendants, and in doing the acts alleged herein, were acting within the course of scope of such agency. The Individual Defendants ratified and/or authorized the wrongful acts of each of the other Individual Defendants. The Individual Defendants, and each of them, are individually sued as participants and as aiders and abettors in the improper acts, plans, schemes, and transactions that are the subject of this Complaint.

70. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of the improper acts, plans, schemes, and transactions that are the subject of this Complaint. In addition to

SHAREHOLDER DERIVATIVE COMPLAINT

the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

71. The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct, by failing to maintain adequate internal controls at the Company and covering up discrimination at the Company.

72. During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did circumvent the internal controls at the Company and caused the Company to cover up Cisco executives' discrimination. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

73. The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, and waste of corporate assets; and to conceal adverse information concerning the Company's operations.

74. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by intentionally circumventing internal controls at the Company and causing the Company to cover up discrimination at the Company. Because the actions described herein occurred under the authority of the Board, each the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

75. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each

25

Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

### E. The Directors' Roles and Committees at Cisco

76. The following chart sets forth the directors of Cisco as set forth in the Company's most recent Proxy Statement and the committees on which they serve:

| | Audit | Compensation and Management Development | Nomination and Governance | Acquisition | Finance |
|---|---|---|---|---|---|
| M. Michele Burns | ▲ | | | | |
| Wesley G. Bush | | ▲ | | | ▲ |
| Michael D. Capellas | | | ▲ | ▲ | |
| Mark Garrett | ▲ | | ▲ | | |
| Dr. Kristina M. Johnson | | ▲ | | | ▲ |
| Roderick C. McGeary | ▲ | ▲ | ▲ | | |
| Chuck Robbins ☆ | | | | | |
| Arun Sarin KBE | | | ▲ | ▲ | |
| Brenton L. Saunders | | ▲ | | ▲ | |
| Dr. Lisa Su ☆ | | | | ▲ | |

☐ Lead Independent Director   ▲ Chair   ▲ Member   ☆ Inside Director

## VI. SUBSTANTIVE ALLEGATIONS

77. Cisco says that its commitment to diversity starts at the top. If that is true, then Cisco is not actively committed to diversity at the Company. The statistics bear this out. Cisco's Board has no Black members. There are no Blacks on Cisco's executive management team. Overall, there are a meager 3.8% Black employees at the Company. *Cisco's proxy materials and Corporate Social Responsibility Reports going back to at*

26

*least 2012 demonstrate that there have been no African-Americans, no Hispanics, no American Indians, no Alaska Natives, no native Hawaiians and no Pacific Islanders on the Board.*

78. The lack of diversity at the top at Cisco is significant. The Board bears ultimate responsibility for ensuring the Company's compliance with federal and state laws prohibiting discrimination based on race, gender, and other factors. Diversity in the workforce is a strong indication of a lack of discrimination; conversely, a lack of diversity provides a strong indication that discrimination is present.

**A. At All Relevant Times, the Individual Defendants Have Had Actual Knowledge that Cisco has Repeatedly Violated Anti-Discrimination Laws, and That Cisco Has Failed to Comply with Its Own Policies of Promoting Diversity and Prohibiting Discrimination, Yet the Individual Defendants Have Continued to Refuse to Nominate Black Individuals and Minorities to the Board**

79. Cisco, led by Chuck Robbins and the Board, has consistently failed to appoint Black individuals and minorities to its Board and to management positions within the Company.

80. Cisco's overall workforce, as of 2019, was 89 percent white or Asian, and a full 93 percent of its vice president level workforce was white or Asian.[14] Those numbers represent a mere 1 percentage point decrease in the overall workforce number for 2017 and 2018 and remain completely static for the vice president level workforce from 2017 and 2018.

///

///

///

---

[14] Cisco's 2019 CSR Report, at 47-8.

27



81.     Despite touting its signatory status on the White House Equal Pay Pledge and its participation in the Employers for Pay Parity Consortium, Cisco does not include identifiable pay parity statistics in its Proxy Statements and Annual Reports for the years

SHAREHOLDER DERIVATIVE COMPLAINT

2017, 2018 and 2019.

82. Further, even the cursory, summary pay parity statements included in Cisco's CSR Reports from 2018 and 2019 demonstrate that twice as many employees experienced discriminatory pay disparity in 2019 as in 2018.

83. The Caste Discrimination Lawsuit points out that pay disparity is but one symptom of a more widespread discrimination and lack of diversity problem. Cisco has not yet responded to or made a public statement regarding the Caste Discrimination Lawsuit.

84. The Board has had actual knowledge of all these facts at all relevant times.

**B. The Director Defendants Breached Their Fiduciary Duty of Candor by Causing Cisco to Include False and Misleading Statements in Cisco's Proxy Statements**

85. Notwithstanding their knowledge about Cisco's failure to promote and achieve diversity and its discriminatory pay practices, the Director Defendants have breached their fiduciary duty of candor by causing Cisco to consistently make false statements about Cisco's commitment to diversity and the promotion of Blacks and other minority employees to positions of management and power at Cisco. In the 2019 Proxy, signed by Directors Burns, Bush, Capellas, Garrett, Johnson, McGeary, Robbins, Sarin, Saunders, and Tomé, the Directors represented that:

**Board Refreshment**

...

As part of its consideration of director succession, the Nomination and Governance Committee from time to time reviews the appropriate skills and characteristics required of board members such as diversity of business experience, viewpoints and personal background, and diversity of skills in technology, finance, marketing, international business, financial reporting and other areas that are expected to contribute to an effective Board of Directors. Additionally, due to the global and complex nature of our business, *the Board believes it is important to consider diversity of race, ethnicity, gender, age, education, cultural background, and professional experiences in evaluating board candidates in order to provide practical insights and diverse perspectives.*

29

86. The 2019 Proxy also stated:

**Business Experience and Qualifications of Nominees**

...

The table below summarizes key qualifications, skills and attributes most relevant to the decision to nominate the candidates to serve on the Board of Directors. A mark indicates a specific area of focus or experience on which the Board relies most. The lack of a mark does not mean the director nominee does not possess that qualification or skill. Each director nominee biography above in this section describes each nominee's qualifications and relevant experience in more detail.

| Director Nominees | Leadership | Technology | Financial Experience | Global Business | Gender/ Ethnic Diversity | Sales and Marketing | Academia | Public Company Board Experience |
|---|---|---|---|---|---|---|---|---|
| M. Michele Burns | ✓ | | ✓ | ✓ | ✓ | | | ✓ |
| Wesley G. Bush | ✓ | ✓ | ✓ | ✓ | | | | ✓ |
| Michael D. Capellas | ✓ | ✓ | ✓ | ✓ | | ✓ | | ✓ |
| Mark Garrett | ✓ | ✓ | ✓ | ✓ | | | | ✓ |
| Dr. Kristina M. Johnson | ✓ | ✓ | | | ✓ | | ✓ | ✓ |
| Roderick C. McGeary | ✓ | ✓ | ✓ | ✓ | | | | ✓ |
| Charles H. Robbins | ✓ | ✓ | | ✓ | | ✓ | | ✓ |
| Arun Sarin | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | ✓ |
| Brenton L. Saunders | ✓ | | ✓ | ✓ | | ✓ | | ✓ |
| Carol B. Tomé | ✓ | | ✓ | ✓ | ✓ | | | ✓ |

87. These statements were false and misleading. In reality, regardless of whether Cisco's Nomination and Governance Committee (comprised of Defendants Capellas, Garrett and McGeary) ever made any efforts to recruit any Black individuals and other racial and ethnic, non-Asian minorities to the Board, no Black individuals currently serve on the Board. Actions speak louder than words. In fact, the Board has never in good faith actively sought minority candidates. The phrase "believes it is important to consider diversity of race, ethnicity" implies that in fact active, good faith efforts have been made, when in reality Cisco has not actively sought to recruit racial and ethnic minorities and has just attempted to create the false impression that it is "important" to do so. This is the very definition of a misleading statement.

SHAREHOLDER DERIVATIVE COMPLAINT

1    88.    Moreover, Cisco's statements about Board diversity were highly material

2    to investors.[15]

3    89.    To attempt to justify its failure to break from a status quo rooted in

4    systemic racism, Cisco's Board has resisted efforts to appoint racially and ethnically

5    diverse members to its Board by claiming that the individuals who have served on the

6    Board for, in some cases going on two decades, are already diverse or have experience

7    that is valuable to the Company.  But the statements caused to be made by the Board in

8    the 2019 Proxy show that the single non-gender diverse member of the Board has been

9    serving since 2009.[16]  This is true even though six of the other nine available director

10   positions have been filled or re-filled since that time.

11   90.    These statements were made with knowledge or reckless disregard of their

12   falsity and with intent to mislead shareholders.

13   91.    In reality, the Director Defendants' refusal to appoint new Black and non-

14   gender-based minority members to the Board represents explicit or implicit racism at

15   Cisco and an improper pretext for failing to add Black and non-gender-based minority

16   individuals to the Board.  In misrepresenting the reason for failing to add new members

17   to its Board, the Director Defendants made intentionally or recklessly false statements in

18   order to get themselves re-elected and to conceal the true reasons for Cisco's long-

19   standing failure to add Black individuals to its Board.

20   92.    The 2019 Proxy contained a "Shareholder Proposal 4 – Independent Board

21   Chairman," which asked shareholders to vote in favor of requiring Cisco to replace

22

23   _____

24   [15] See Arleen Jacobius, "Calpers Turns Focus to Board Diversity in Proxy Voting," PENSIONS & INVESTMENTS, Sept. 17, 2018 (in 2018, Calpers voted against 438 directors at 141 different companies based on the companies' failure to respond to Calpers' efforts to increase board diversity).

25   [16] 2019 Proxy, at 7.

26

27

28

SHAREHOLDER DERIVATIVE COMPLAINT

Robbins as Chairman with an independent director. The proposal stated in part:

> Shareholders request our Board of Directors to adopt a policy to require that the Chairman of the Board be an independent member of the Board whenever possible. The Board would have the discretion to phase in this policy for the next Chief Executive Officer transition, implemented so it does not violate any existing agreement.

> If the Board determines that a Chairman, who was independent when selected is no longer independent, the Board shall select a new Chairman who satisfies the requirements of the policy within a reasonable amount of time. Compliance with this policy is waived if no independent director is available and willing to serve as Chairman.

> Caterpillar was an example of a company changing course and naming an independent board chairman. Caterpillar had even opposed a shareholder proposal for an independent board chairman at its annual meeting shortly before changing course. Wells Fargo also changed course and named an independent board chairman.

> An independent board chairman can better focus on improving the performance of our directors. Improvement is needed since Carol Bartz, Michele Burns, Charles Robbins and Steven West each received more than 190 million against votes at our 2018 annual meeting. This compares poorly with 3 Cisco directors who received less than 9 million against votes each. This proposal topic received 35%-support at the 2018 Cisco annual meeting — up form [sic] 27%-suport previously. Adoption of this proposal will cost our company virtually nothing — yet can lead to improved director performance.

93.    In response to this proposal, the Director Defendants caused Cisco to file an opposition position in the Proxy which stated:

> The Board of Directors believes that it should maintain flexibility to set Cisco's Chairman and board leadership structure as it deems appropriate from time to time. Effective corporate governance is not merely a "one size fits all" approach, and we believe it is not in the best interest of our shareholders to place arbitrary constraints on the Board of Directors' ability to determine a leadership structure that will work best given the complex dynamics of the Board of Directors, senior management and other factors at any particular time.

> In particular, as corporate governance experts have recognized, a strong, empowered and independent Lead Independent Director role, such as Cisco has, fulfills the goals espoused by those who want to arbitrarily require an independent Chairman. In our view, the decision of who should serve in the role of Chairman, and whether the role should be filled by an independent or a non-independent director, at any given time should be the responsibility of the Board of Directors, rather than be dictated by a rigid rule that assumes that the same leadership structure would work best at all times. Departing from Cisco's current policy of permitting a non-

32

independent director to serve as Chairman would limit the Board's ability to select the director it believes is best suited to serve as Chairman based on the circumstances at the time.

The Board of Directors believes that it is currently in the best interest of Cisco and its shareholders for Mr. Robbins to serve as both CEO and Chairman, and that the role of Chairman and CEO, together with the role of the Lead Independent Director and Cisco's other strong corporate governance policies and practices, provides an appropriate balance in Cisco's leadership. As discussed under "Corporate Governance — Board Leadership Structure" above, in designating Mr. Robbins as Chairman, the Board of Directors considered Mr. Robbins' demonstrated leadership during his tenure at Cisco, and the Board of Directors believes that Mr. Robbins' ability to speak as Chairman and CEO provides strong unified leadership for Cisco. The Board believes that the 61 Table of Contents flexibility to make such a determination with respect to a future CEO, just as in the case of Mr. Robbins, is justified by the features of Cisco's corporate governance structure:

• Robust Lead Independent Director role. The role given to the Lead Independent Director helps ensure a strong independent and active Board of Directors. Our Lead Independent Director is elected by and from the independent board members, and each term of service in the Lead Independent Director position is one year. As further described in our corporate governance policies and under "Corporate Governance — Board Leadership Structure" above, the Lead Independent Director has clearly delineated and comprehensive duties.

94. These statements were false and misleading because the Director Defendants did not genuinely believe them. Cisco at all relevant times has lacked an independent Chairman, resulting in great harm to Cisco as the Company, controlled by Robbins, engaged in unlawful conduct with respect to discriminatory hiring and pay practices. A statement of support from the Directors would have likely substantially altered the votes at the 2019 Annual Meeting and been material to the voting decisions of shareholders.

95. The false statements had their desired effect. At Cisco's annual meeting in December 2019, all the incumbent directors were re-elected, and the one white, non-gender minority board-proposed new director was elected. No competing Black or minority candidates made it on the ballot. The shareholder proposal to replace Robbins as Chairman with an independent Chairman was defeated. PwC was re-appointed as the Company's auditor for the 32nd year in a row.

33

96. Cisco published the results of the voting at its annual meeting in a Form 8-K filed on Dec. 10, 2019:

**Submission of Matters to a Vote of Security Holders.**

The Annual Meeting of Shareholders (the "Meeting") of Cisco Systems, Inc. ("Cisco") was held on December 10, 2019. At the Meeting, the shareholders voted on the following four proposals and cast their votes as follows:

| Nominee | For | Against | Abstained | Broker Non-Votes |
|---|---|---|---|---|
| M. Michele Burns | 2,796,477,870 | 120,135,867 | 10,317,660 | 521,656,476 |
| Wesley G. Bush | 2,809,971,945 | 6,450,765 | 11,126,981 | 521,656,476 |
| Michael D. Capellas | 2,752,930,202 | 163,330,891 | 10,670,301 | 521,656,476 |
| Mark Garrett | 2,962,649,640 | 10,546,587 | 11,152,809 | 521,656,476 |
| Dr. Kristina M. Johnson | 2,892,190,994 | 24,124,062 | 10,616,401 | 521,656,476 |
| Roderick C. McGeary | 2,788,752,126 | 149,065,924 | 10,716,529 | 521,656,476 |
| Charles H. Robbins | 2,730,378,728 | 160,952,487 | 35,620,182 | 521,656,476 |
| Arun Sarin | 2,962,641,927 | 9,045,505 | 11,029,982 | 521,656,476 |
| Brenton L. Saunders | 2,887,800,540 | 28,026,394 | 11,104,463 | 521,656,476 |
| Carol B. Tomé | 2,909,791,929 | 5,962,906 | 11,145,562 | 521,656,476 |

Proposal 2: To approve, on an advisory basis, executive compensation:

| For | Against | Abstained | Broker Non-Votes |
|---|---|---|---|
| 2,751,321,171 | 154,791,806 | 20,818,420 | 621,656,476 |

Proposal 3: To ratify the appointment of PricewaterhouseCoopers LLP as Cisco's independent registered public accounting firm for the fiscal year ending July 25, 2020:

| For | Against | Abstained | Broker Non-Votes |
|---|---|---|---|
| 3,375,076,971 | 161,943,974 | 11,566,928 | 0 |

Proposal 4: A shareholder proposal to have Cisco's Board adopt a new policy to have an independent Board chairman.

| For | Against | Abstained | Broker Non-Votes |
|---|---|---|---|
| 833,821,241 | 2,076,320,186 | 16,789,970 | 621,656,476 |

97. The 2019 Proxy was materially misleading because it failed to disclose:

(a) That the Company's stated policies with respect to diversity and anti-discrimination were not effective and were not being complied with;

(b) That the Board's Governance Committee did not take racial and ethnic diversity into consideration when evaluating potential Board candidates, and instead simply claimed to do so in order to create a false appearance of compliance with the law;

(c) That the Director Defendants did not genuinely believe the statement in the Proxy that it was not in the Company's best interests, or necessary, to have an independent Chairman since the current governance structure was working effectively; in fact, as demonstrated herein and below, the Individual Defendants all knew that Cisco's best interests were not being adequately protected by Robbins serving as Chairman, as amply demonstrated by the recently filed California Department of Fair Employment and Housing

34

SHAREHOLDER DERIVATIVE COMPLAINT

lawsuit alleging Indian caste harassment and pay discrimination at Cisco and Cisco's March 2020 $4.75 million settlement of a Department of Labor claim that Cisco underpaid its female and minority employees compared to its white male employees;

(d)     That Defendants had knowledge that the Company's internal controls and systems were inadequate and ineffective to protect minorities against discrimination in hiring, promotion, and other critical terms of employment and equal access, and that rampant unlawful discrimination exists at the Company;

(e)     That the Defendants had knowledge of continuing and repeated violations of federal policies and laws due to discriminatory pay practices that adversely affected minorities and women;

(f)     That the Company was preferring the hiring of Asian Indians of the Brahmin, Hindu and other upper castes over other minorities and women;

(g)     That Defendants failed to maintain appropriate policies, internal controls, and procedures to ensure that the Company's stated policies with respect to diversity and anti-discrimination were being complied with;

(h)     That Defendants failed to appropriately address the Company's lack of diversity and discriminatory practices towards minorities in hiring and promotion and misleading claims regarding the same; and

(i)     That, as a result, the Company was at substantial risk of large monetary fines, penalties, and adverse judgments in pending lawsuits due to the fact that the Company was not in compliance with federal and state laws regarding hiring, promotion, and pay practices.

98.     The 2019 Proxy harmed the Company by interfering with the proper governance on its behalf that requires stockholders' informed voting of directors. As a result of the false or misleading statements in the 2019 Proxy, stockholders voted to re-elect all of the Defendants to the Board and voted against requiring Cisco to have an

35

1  independent Chairman.

2  99.  The statements in the 2019 Proxy conveyed that the Company's corporate

3  governance structure was "effective" and that the Board's leadership structure allowed it

4  to "participate actively in the oversight of management's actions."  In reality, the

5  Company's corporate governance structure and defective internal controls allowed

6  senior executives and the Board to sidestep real accountability and instead continue

7  perpetuating the discriminatory practices that led to the DOL investigation regarding

8  the Company's discriminatory pay practices, the California Caste Discrimination

9  Lawsuit, and other discrimination in hiring practices and lack of racial and ethnic

10  diversity on both the Board and management.

11  100.  The 2019 Proxy, which contained materially misleading statements and

12  thus deprived shareholders of adequate information necessary to make a reasonably

13  informed decision, caused the Company's stockholders to re-elect nine of the Defendants

14  to the Board while they were breaching their fiduciary duties to the Company and

15  deliberately concealing material information concerning the Company's discrimination

16  against Black individuals and other minorities and its effects on the Company's business

17  and reputation.

18  101.  The Company and its shareholders were harmed by the approval of

19  incentive compensation awards to certain of the Individual Defendants, such as

20  executive officer Robbins, and others, who helped perpetrate the illegal discriminatory

21  hiring and compensation practices.  Had shareholders known of the underlying

22  misconduct at the Company, they would not have voted to keep the same Directors who

23  were allowing the illegal practices to continue.  Even if the alleged discriminatory

24  practices began before the Proxy Statements issued, they continued after the Proxy

25  Statements issued because Board members elected by shareholders pursuant to the

26  Proxy Statements allowed the practice to continue.

27  ///

28

36

102. **2018 PROXY** — The statements above that the Director Defendants caused the Company to make in the 2019 Proxy were substantially identical to statements they had caused Cisco to include in the 2018 Proxy, which was filed by Cisco with the SEC on October 24, 2018. The 2018 Proxy contained a shareholder proposal asking that Cisco be required to have an independent Chairman that was substantially identical to the same proposal in the 2019 Proxy.

103. The 2018 Proxy was approved by the Directors below, and the table below identifies committee membership as of October 15, 2018, the record date of the 2018



| Current Directors | Leadership | Technology | Financial Experience | Global Business | Gender/Ethnic Diversity | Sales and Marketing | Academia | Public Company Board Experience |
|---|---|---|---|---|---|---|---|---|
| Carol A. Bartz | ✓ | ✓ | | ✓ | ✓ | ✓ | | ✓ |
| M. Michele Burns | ✓ | | ✓ | ✓ | ✓ | | | ✓ |
| Michael D. Capellas | ✓ | ✓ | ✓ | ✓ | | ✓ | | ✓ |
| Mark Garrett | ✓ | ✓ | ✓ | | | | | ✓ |
| Dr. John L. Hennessy | ✓ | ✓ | | | | | ✓ | ✓ |
| Dr. Kristina M. Johnson | ✓ | ✓ | | | ✓ | | ✓ | ✓ |
| Roderick C. McGeary | ✓ | ✓ | ✓ | ✓ | | | | ✓ |
| Charles H. Robbins | ✓ | ✓ | | ✓ | | | | ✓ |
| Arun Sarin | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | ✓ |
| Brenton L. Saunders | ✓ | | ✓ | ✓ | | ✓ | | ✓ |
| Steven M. West | ✓ | ✓ | | ✓ | | | | ✓ |

104. For example, similar to the language in the 2019 Proxy, the 2018 Proxy stated the following:

> The Board believes it is important to consider diversity of race, ethnicity, gender, age, education, cultural background, and professional experiences in evaluating board candidates in order to provide practical insights and diverse perspectives.[17]

105. The 2018 Proxy also contained a proposal submitted by the Director Defendants asking shareholders to approve executive compensation at the Company:

---

[17] *See* Cisco's 2018 Proxy at 26.

37

## Proposal No. 3 — Advisory Vote to Approve Executive Compensation

Under Section 14A of the Exchange Act, Cisco shareholders are entitled to cast an advisory vote to approve the compensation of Cisco's named executive officers, known as a "Say on Pay" vote. The shareholder vote is an advisory vote only and is not binding on Cisco or its Board of Directors. Although the vote is non-binding, the Board of Directors and the Compensation Committee value the opinions of our shareholders, and will consider the outcome of the vote when making future compensation decisions for our named executive officers.

### *Fiscal 2018 Pay Levels*

The following table compares fiscal 2017 and fiscal 2018 total direct compensation ("TDC") for our CEO against Cisco's total shareholder return ("TSR"):

| | Fiscal 2018 ($) | Fiscal 2017 ($) | Year over Year Change |
|---|---|---|---|
| Absolute Total Shareholder Return 1 | | | 39% |
| CEO Total Direct Compensation | | | 21% |
| Reported Earned Base Salary | $ 1,231,250 | $ 1,187,308 | |
| Reported Earned Bonus | 4,990,711 | 2,532,352 | |
| Target LTI Value 2 | 14,691,830 | 13,511,474 | |
| Total Direct Compensation 3 | $20,913,791 | $17,231,134 | |

1   TSR is measured against the stock price as of the end of fiscal 2017 and includes the reinvestment of all dividends.

2   Represents the target value of equity awards granted in fiscal 2017 and fiscal 2018. For a more detailed description, see the "Fiscal 2018 Compensation — Long-Term Equity-Based Incentive Awards" section in the CD&A.

3   This table is not intended to be a substitute for the "Compensation Committee Matters — Fiscal 2018 Compensation Tables — Summary Compensation Table." This table does not include certain amounts which appear in the Summary Compensation Table, and the Target LTI Value for fiscal 2017 and fiscal 2018 is different from the amounts reported in the "Stock Awards" column of the Summary Compensation Table for such fiscal years.

The payouts for PRSUs with a three-year performance period granted in fiscal 2016, 2015, and 2014 were as follows:



### *Fiscal 2018 Pay Structure — Pay for Performance*

The majority of our named executive officers' pay is performance-based and we have limited perquisites and benefits, as illustrated below.



Our named executive officers have:

| | |
|---|---|
| NO supplemental executive retirement plans | NO severance agreements |
| NO defined benefit pension plans | NO change in control agreements |
| NO employment agreements | NO "golden parachute" excise tax gross-ups |

SHAREHOLDER DERIVATIVE COMPLAINT

106. These statements in the 2018 Proxy were false and misleading for the same reasons alleged above with respect to the false statements in the 2019 Proxy. Similar to the 2019 Proxy, the 2018 Proxy contained shareholder proposals for an independent chairman of the Board and for a Pay Equity Report. Similar to 2019, in 2018 the Director Defendants caused Cisco to oppose those proposals with language that was substantially identical to the language quoted *supra* from the 2019 Proxy. Both such proposals were defeated in 2018, too.

107. On November 16, 2018, Cisco filed a Form 8-K disclosing the results of the voting at the 2018 annual meeting. The Form 8-K stated:

> At the Annual Meeting of Shareholders (the "Meeting") of Cisco Systems, Inc. ("Cisco") held on December 12, 2018, Cisco's shareholders approved the amendment and restatement of the Cisco Employee Stock Purchase Plan (the "Purchase Plan"). The amendment and restatement of the Purchase Plan was approved by Cisco's Board of Directors (the "Board") on October 3, 2018, subject to the approval of Cisco's shareholders, and became effective with such shareholder approval on December 12, 2018. As a result of such shareholder approval, the Purchase Plan was materially amended and modified to (i) extend the term by ten years and (ii) increase the maximum number of shares of common stock authorized for issuance over the term of the Purchase Plan by 100 million shares.

**Proposal 1**: To elect nine members of Cisco's Board:

| Nominee | For | Against | Abstained | Broker Non-Votes |
|---|---|---|---|---|
| M. Michele Burns | 2,987,137,258 | 188,248,050 | 7,833,895 | 746,069,777 |
| Michael D. Capellas | 3,083,737,498 | 91,232,387 | 8,269,228 | 746,069,777 |
| Mark Garrett | 3,169,175,897 | 5,737,183 | 8,306,033 | 746,069,777 |
| Dr. Kristina M. Johnson | 3,152,852,274 | 20,219,443 | 10,147,396 | 746,069,777 |
| Roderick C. McGeary | 2,965,266,146 | 189,605,490 | 8,347,477 | 746,069,777 |
| Charles H. Robbins | 2,959,004,742 | 201,859,995 | 22,354,376 | 746,069,777 |
| Arun Sarin | 3,165,962,435 | 8,821,057 | 8,435,621 | 746,069,777 |
| Brenton L. Saunders | 3,118,091,435 | 56,989,890 | 8,137,783 | 746,069,777 |
| Steven M. West | 3,023,630,638 | 151,145,284 | 8,445,191 | 746,069,777 |

**Proposal 2**: To approve the amendment and restatement of the Cisco Employee Stock Purchase Plan:

| For | Against | Abstained | Broker Non-Votes |
|---|---|---|---|
| 3,150,813,337 | 21,552,319 | 10,853,257 | 746,069,777 |

39

**Proposal 3**: To approve, on an advisory basis, executive compensation:

| For | Against | Abstained | Broker Non-Votes |
|---|---|---|---|
| 3,602,502,244 | 564,105,454 | 16,608,405 | 746,069,777 |

**Proposal 4**: To ratify the appointment of PricewaterhouseCoopers LLP as Cisco's independent registered public accounting firm for the fiscal year ending July 27, 2019:

| For | Against | Abstained | Broker Non-Votes |
|---|---|---|---|
| 3,801,691,271 | 117,691,079 | 9,855,800 | 0 |

**Proposal 5:** A shareholder proposal to have Cisco's Board adopt a new policy to have an independent Board chairman.

| For | Against | Abstained | Broker Non-Votes |
|---|---|---|---|
| 1,319,274,550 | 2,946,111,140 | 16,823,415 | 746,069,777 |

**Proposal 6:** A shareholder proposal to have Cisco's Board adopt a proposal relating to executive compensation metrics.

| For | Against | Abstained | Broker Non-Votes |
|---|---|---|---|
| 101,505,213 | 2,971,915,256 | 10,198,635 | 746,069,777 |

**C.    Cisco's Nominating and Corporate Governance Committee Members Have Repeatedly Breached Their Fiduciary Duties to Ensure Diversity on the Board**

108.    The Charter of the Nominating and Governance Committee states the following with respect to the duties of the Board members serving on such committee:

**RESPONSIBILITIES AND DUTIES**

In carrying out the purpose set forth in Section 1 above, the Committee shall:

1. *Identify and review candidates for the Board and recommend to the full Board candidates for election to the Board, and from time to time review the process for identifying and evaluating candidates for election to the Board.* The Committee may engage consultants or third-party search firms to assist in identifying and evaluating potential nominees.

///

///

40

2. *Review from time to time the appropriate skills and characteristics required of Board members, including such factors as business experience, diversity, and personal skills in technology, finance, marketing, international business, financial reporting and other areas that are expected to contribute to an effective Board.*

3. Review and assess director independence with respect to continuing and prospective directors, and make recommendations to the Board.

4. Make recommendations to the Board regarding the size, structure and composition of the Board and its committees.

5. *Oversee the annual Board performance evaluation process, including performance evaluation of each committee of the Board and individual Board members.*

6. Periodically review the Company's corporate governance policies and recommend to the Board modifications to the policies as appropriate.

7. Review the Company's policies and programs concerning corporate social responsibility, including environmental, social and governance matters.

8. Review and recommend compensation for non-employee members of the Board, including but not limited to the following elements: retainer, meeting fees, committee fees, committee chair fees, equity or stock compensation, deferred compensation, benefits and perquisites.

9. Have full access to the Company's executives as necessary to carry out this responsibility.

10. Perform any other activities consistent with this Charter, the Company's Bylaws and governing law as the Committee or the Board deems necessary or appropriate.

11. Review the Committee Charter from time to time for adequacy and recommend any changes to the Board.

12. Report to the Board on the major items covered at each Committee meeting.[18]

///

---

[18] *Available at* https://investor.cisco.com/corporate-governance/nomination-and-governance-committee-charter/default.aspx, last visited September 11, 2020.

SHAREHOLDER DERIVATIVE COMPLAINT

109. The 2019 Proxy also stated the following with respect to the Nominating and Governance Committee responsibilities:

> The Nomination and Governance Committee is responsible for overseeing, reviewing and making periodic recommendations concerning Cisco's corporate governance policies, for reviewing Cisco's policies and programs concerning CSR (including ESG matters), for reviewing and assessing director independence, for making recommendations regarding the size, structure and composition of the Board and its committees, for overseeing the annual Board evaluation process, for recommending to the full Board of Directors candidates for election to the Board of Directors, and for reviewing and recommending compensation for non-employee members of the Board. Each member of this committee is an independent director under applicable Nasdaq listing standards.

110. The members of the Committee (Capellas, Garrett, and McGeary) have breached their fiduciary duties as directors by failing to fulfill these duties. Rather than causing Cisco to comply with the principles it claims to follow with respect to its corporate governance, Capellas, Garrett, and McGeary have caused Cisco to merely pay lip service to these principles. Instead of recommending well-qualified Black and minority candidates to serve on Cisco's Board, Capellas, Garrett, and McGeary have perpetuated the all-white Board under the pretext that the existing members' "experience" and long tenure on the Board is beneficial to Cisco.

111. Moreover, to entrench themselves and their fellow directors in office, all the Director Defendants have opposed term limits in order to prevent the addition of qualified Black and minority candidates to the Board.

112. As the saying goes, the rich get richer while the poor get poorer. Serving on Cisco's Board has enriched the already-rich elites whose profitable sinecure has been perpetuated by the Defendants' wrongdoing. Many qualified Black and minority candidates would benefit greatly from the prestige and compensation that comes with a position on Cisco's Board. The following chart sets forth the compensation earned by outside directors on Cisco's Board in 2019:

///

///

42

*Fiscal 2019 Director Compensation*

The following table provides information as to compensation earned by the non-employee directors during fiscal 2019.

Director Compensation

| Name | Fees Earned or Paid in Cash ($) | Stock Awards ($)(1) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|
| Carol A. Bartz (2) | $ 6,000 | $ — | — | $ 6,000 |
| M. Michele Burns | $ 133,000 | $ 224,960 | — | $ 357,960 |
| Wesley G. Bush | $ 44,738(3) | $ 125,814 | — | $ 170,552 |
| Michael D. Capellas | $ 159,000(3) | $ 224,960 | — | $ 383,960 |
| Mark Garrett | $ 141,000 | $ 224,960 | — | $ 365,960 |
| Dr. John L. Hennessy (2) | $ 6,000 | $ — | — | $ 6,000 |
| Dr. Kristina M. Johnson | $ 102,000 | $ 224,960 | — | $ 326,960 |
| Roderick C. McGeary | $ 156,000 | $ 224,960 | — | $ 380,960 |
| Arun Sarin | $ 116,000 | $ 224,960 | — | $ 340,960 |
| Brenton L. Saunders | $ 98,000 | $ 224,960 | — | $ 322,960 |
| Steven M. West | $ 130,000 | $ 224,960 | — | $ 354,960 |

**D.  The Director Defendants Breached Their Duties of Loyalty and Good Faith by Failing to Ensure the Company's Compliance with Federal and State Laws Regarding Diversity and Anti-Discrimination**

113.  The Director Defendants have known for years that Cisco has been violating federal and state laws regarding diversity, equal pay, and discrimination against minorities.

114.  Defendants' knowledge is reflected by the fact that, as recently as 2017, Cisco was still trying to hide the facts and statistics about its lack of workforce diversity, arguing the demographic data was a trade secret. Cisco was one of the few companies in Silicon Valley doing so; another company which tried to hide the information was Palantir.[19]

115.  In addition to improperly claiming that the diversity statistics were trade secrets, Cisco refused to publish annual diversity reports, thus enabling the Company to

---

[19] *See* Natasha Tiku, *Cisco Allegedly Underpaid Women and Minorities by $400 Million. Now the Details Are Set to Come out in Court*, THE WASHINGTON POST, Dec. 5, 2019.

43

attempt to hide the lack of diversity. The Director Defendants were aware of this and were complicit in these acts, thus demonstrating their scienter about Cisco's failure to ensure diversity and failure to pay minorities equal pay.

**E.  The Board Has Breached Its Duties by Failing to Ensure an Independent Chairman**

116.  There is no independent Chairman of the Board at Cisco. Chuck Robbins fills that role as well as serving as CEO and member of the Board. Given his multiple, high level positions within Cisco, as Chairman, Robbins is not independent.

117.  Simply put, the Director Defendants had a fiduciary duty to ensure that the Chairman of the Board was independent. They have completely failed to do so, and their failure to do so has been a huge part of the problem, allowing the lack of diversity to continue at Cisco, both among the management ranks and on the Board itself. The Director Defendants' failure to insist upon an independent Chairman at Cisco allowed Robbins to pursue a meritless personal gain, thus creating its financial statements to present a false and misleading picture of its financial condition.

**F.  The Director Defendants Have Breached Their Duties by Continually Re-Hiring PricewaterhouseCoopers LLP as the Company's Auditor**

118.  PricewaterhouseCoopers LLP ("PwC") is the Company's auditor, and has been so since 1988 — *thirty-two* years and counting.

119.  As Cisco's Proxy Statement from 2019 disclosed, the following table sets forth the approximate aggregate fees billed to Cisco by PwC for fiscal 2019 and fiscal 2018:

| Fee Category | Fiscal 2019 Fees | Fiscal 2018 Fees |
|---|---|---|
| Audit Fees | $ 25,040,000 | $ 23,305,000 |
| Audit-Related Fees | 1,980,000 | 11,135,000 |
| Tax Fees | 3,730,000 | 4,375,000 |
| All Other Fees | 50,000 | 50,000 |
| Total Fees | $ 30,800,000 | $ 38,865,000 |

44

120.    Despite billing Cisco over $38 million in fees in both 2018 and 2019, PwC has completely failed to properly audit and assess the Company's internal controls.

121.    Defendants Garrett (Chair), Burns and McGeary, as the members of Cisco's Audit Committee, are responsible for selecting and monitoring PwC. The Company's 2019 Proxy states:

> ... The Audit Committee has appointed PwC as Cisco's independent registered public accounting firm for fiscal 2020 and is responsible for pre-approving all audit and permissible non-audit services to be provided by PwC. PwC has audited Cisco's consolidated financial statements annually since fiscal 1988. In order to assure continuing auditor independence, the Audit Committee considers non-audit fees and services when assessing auditor independence and periodically considers whether there should be a regular rotation of the independent registered public accounting firm. Further, in conjunction with the mandated rotation of the audit firm's lead engagement partner, the Chairman and other members of the Audit Committee are directly involved in the selection of PwC's new lead engagement partner, including the most recent selection of PwC's lead engagement partner for the period of service beginning with fiscal 2019. The members of the Audit Committee and the Board believe that the continued retention of PwC to serve as Cisco's independent registered public accounting firm is in the best interests of Cisco and its shareholders.

122.    The 2019 Proxy Statement also represented that:

> The Audit Committee's policy is to pre-approve all audit and permissible non-audit services to be provided by the independent registered public accounting firm. These services may include audit services, audit-related services, tax services and other services. Pre-approval is generally provided for up to one year and any pre-approval is detailed as to the particular service or category of services and is generally subject to a specific budget. The independent registered public accounting firm and management are required to report periodically to the Audit Committee regarding the extent of services provided by the independent registered public accounting firm in accordance with this pre-approval, and the fees for the services performed to date. The Audit Committee may also pre-approve particular services on a case-by-case basis.

123.    Defendants Garrett (Chair), Burns and McGeary, as the members of Cisco's Audit Committee, also prepared and included a report in the 2019 Proxy as follows:

**Audit Committee Report**

> The Audit Committee has reviewed and discussed with Cisco's management and PricewaterhouseCoopers LLP the audited consolidated financial statements of Cisco contained in Cisco's Annual Report on Form 10-K for the 2019 fiscal year. The Audit Committee has also discussed with PricewaterhouseCoopers LLP the matters required to be discussed by the

45

applicable requirements of the Public Company Accounting Oversight Board and the SEC.

The Audit Committee has received and reviewed the written disclosures and the letter from PricewaterhouseCoopers LLP required by applicable requirements of the Public Company Accounting Oversight Board regarding the independent accountant's communications with the Audit Committee concerning independence, and has discussed with PricewaterhouseCoopers LLP its independence from Cisco.

Based on the review and discussions referred to above, the Audit Committee recommended to the Board of Directors that the audited consolidated financial statements be included in Cisco's Annual Report on Form 10-K for its 2019 fiscal year for filing with the Securities and Exchange Commission.

Submitted by the Audit Committee

Mark Garrett, Chairperson
M. Michele Burns
Roderick C. McGeary
Steven M. West

124. PwC has served as Cisco's auditor *since 1988*, giving rise to a cozy and clubby relationship between PwC and Cisco which is not conducive to effective auditing. The Company's compliance with its stated policies concerning the alleged commitment to diversity has been abysmal to the point of being basically non-existent.

125. The very purpose of an auditor is to assess the Company's internal controls and determine if they are functioning effectively. Rather than doing so, PwC has wrongfully and consistently given Cisco's internal controls a clean bill of health and has failed to point out the obvious — that Cisco lacks an effective system of internal controls to ensure that the Company is not discriminating against minorities and is complying with its stated goals and initiatives regarding the promotion of diversity and the avoidance of discrimination and harassment.

126. Defendants Garrett, Burns and McGeary, as the members of the Audit Committee, breached their fiduciary duties by failing to perform their duties on the Audit Committee, including failure to ensure that an adequate audit was being performed of the Company's internal controls regarding diversity, anti-discrimination, anti-harassment, pay equity, and other relevant areas of critical importance to the

46

Company. They also signed the 2019 Proxy Statement that contained false statements regarding the Company's internal controls being effective and adequate, which were false and gave a very misleading and inaccurate portrayal of these key issues to stockholders.

127. Defendants Burns (Chair), Bush, and Johnson, as the members of the Finance Committee, breached their fiduciary duties by failing to perform their duties on the Finance Committee, including failure to ensure that Cisco's compensation policies and programs do not entail excessive risk. At all relevant times, Cisco's compensation policies encouraged excessive risk by providing the potential for huge compensation to Cisco's officers, while at the same time not adequately tying compensation to the achievement of non-financial goals such as diversity and compliance with the law. As a result, the Finance Committee defendants breached their duties to help protect Cisco from legal liability.

128. Defendants Burns (Chair), Bush, and Johnson, as the members of Cisco's Finance Committee, also prepared and included a statement in the 2019 Proxy as follows:

> *The Finance Committee reviews and approves Cisco's* global investment policy; oversees Cisco's stock repurchase programs; and reviews minority investments, fixed income assets, insurance risk management policies and programs, tax programs, currency, interest rate and *equity risk management policies and programs,* and capital structure and capital allocation strategy. This committee is also authorized to approve the issuance of debt securities, certain real estate acquisitions and leases, and charitable contributions made on behalf of Cisco.

## G. The Unjust Compensation Awarded to the Individual Defendants

129. Some of the Defendants received unjust compensation and/or compensation and payments that were higher due to Defendants' wrongdoing and because the Company was more profitable by paying Black individuals and minorities less.

130. Defendants Robbins and Kramer received excessive dividends and equity awards than they would have but for the wrongdoing. If Black and minority employees

SHAREHOLDER DERIVATIVE COMPLAINT

working at Cisco had received fair and equal pay, Cisco would have had higher compensation expenses. Moreover, Robbins and Kramer are large beneficiaries of the Company's dividends because they own 89,660 and 218,113 shares of the Company's stock, respectively. As a result, Robbins received dividends in the last twelve months in the amount of $1.41 per share, or $126,420.60, and Kramer received dividends in the amount of $1.41 per share, or $307,539.33. Further, Robbins' equity awards are reflected in the attached chart from the 2019 Proxy Statement with respect to the cash-based performance awards and stock unit awards in fiscal 2019:

| Name | Grant Date | Estimated Future Payouts Under Non-Equity Incentive Plan Awards | | | Estimated Future Payouts Under Equity Incentive Plan Awards | | | All Other Stock Awards: Number of Shares of Stock or Units (#)(1) | Grant Date Fair Value of Stock Awards ($)(2) |
|------|------|------|------|------|------|------|------|------|------|
| | | Threshold ($) | Target ($) | Maximum ($) | Threshold (#) | Target (#)(1) | Maximum (#) | | |
| Charles H. Robbins | (3) | — | $2,981,250 | $7,155,000 | | | | | |
| | 9/18/18(4) | | | | — | 276,454 | 414,681 | | $9,948,346 |
| | 9/18/18(5) | | | | | | | 99,940 | $4,429,111 |
| Kelly A. Kramer | (3) | — | $1,147,500 | $2,754,000 | | | | | |
| | 9/18/18(4) | | | | — | 157,974 | 236,961 | | $5,170,492 |
| | 9/18/18(5) | | | | | | | 57,109 | $2,530,940 |
| David Goeckeler | (3) | — | $1,113,750 | $2,673,000 | | | | | |
| | 9/18/18(4) | | | | — | 157,974 | 236,961 | | $5,170,492 |
| | 9/18/18(5) | | | | | | | 57,109 | $2,530,940 |
| Maria Martinez | (3) | — | $ 911,250 | $2,187,000 | | | | | |
| | 9/18/18(4) | | | | — | 126,379 | 189,568 | | $4,136,406 |
| | 9/18/18(5) | | | | | | | 45,687 | $2,024,743 |
| Gerri Elliott | (3) | — | $1,012,500 | $2,430,000 | | | | | |
| | 9/18/18(4) | | | | — | 126,379 | 189,568 | | $4,136,406 |
| | 9/18/18(5) | | | | | | | 45,687 | $2,024,743 |

131.    Much of the information about the exact amount of the unjust payments is not publicly available, and has been concealed by Defendants. As a result, Plaintiff requires discovery in order to properly allege the full extent and details of the Defendants' wrongdoing.

132.    However, at a minimum, based on publicly available information, Defendant Robbins, Kramer, and other Defendants have received substantial unjust compensation.

48

133. The Individual Defendants' receipt of this compensation during the relevant time period was unjust in light of their direct participation in the wrongful conduct alleged herein, which constituted bad faith and disloyal conduct. The defendants' receipt of such compensation while they were knowingly or recklessly breaching their fiduciary duties to the Company constitutes unjust compensation that should be recouped by Cisco.

134. The following table provides some additional information about some of the Officer Defendants' compensation during part of the relevant time period:

| Named Executive Officer | Base Salary | Target Award Percentage | Company Performance Factor | Individual Performance Factor | LTIP Payment |
|---|---|---|---|---|---|
| Charles H. Robbins | $ 1,325,000 | 225% | 1.08 | 1.80 | $ 5,705,550 |
| Kelly A. Kramer | $ 850,000 | 135% | 1.08 | 1.70 | $ 2,106,810 |
| David Goeckeler | $ 825,000 | 135% | 1.08 | 1.70 | $ 2,044,845 |
| Maria Martinez | $ 675,000 | 135% | 1.08 | 1.60 | $ 1,574,640 |
| Gerri Elliott | $ 750,000 | 135% | 1.08 | 1.80 | $ 1,968,300 |

135. The Officer Defendants' compensation during the relevant period was also unjust because it significantly exceeded the average employees' pay, as disclosed by the Company in its Proxy:

**CEO Pay Ratio**

As determined in accordance with SEC rules, the fiscal 2019 annual total compensation was $25,829,833 for our CEO as reported in the Summary Compensation Table and $142,593 for our median employee, and the ratio of these amounts is *181 to 1*. The Compensation Committee considers our CEO pay ratio in reviewing and establishing CEO compensation.

136. If Defendant Robbins' 2019 pay was more than 181 times the median employee's compensation, then it must have been an even higher multiple of the median Black or minority employee's compensation given the government's allegations that Cisco unlawfully paid such employees less than other employees for similar jobs. When viewed in light of these facts, the Defendants' compensation was unjust under equitable

49

principles.

137. The following chart provides information about the compensation that the Director Defendants received during 2019:

### Director Compensation

| Name | Fees Earned or Paid in Cash ($) | Stock Awards ($)(1) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|
| Carol A. Bartz (2) | $ 6,000 | $ — | — | $ 6,000 |
| M. Michele Burns | $ 138,000 | $ 224,960 | — | $ 362,960 |
| Wesley G. Bush | $ 44,738(3) | $ 125,814 | — | $ 170,552 |
| Michael D. Capellas | $ 159,000(3) | $ 224,960 | — | $ 383,960 |
| Mark Garrett | $ 141,000 | $ 224,960 | — | $ 365,960 |
| Dr. John L. Hennessy (2) | $ 6,000 | $ — | — | $ 6,000 |
| Dr. Kristina M. Johnson | $ 102,000 | $ 224,960 | — | $ 326,960 |
| Roderick C. McGeary | $ 156,000 | $ 224,960 | — | $ 380,960 |
| Arun Sarin | $ 116,000 | $ 224,960 | — | $ 340,960 |
| Brenton L. Saunders | $ 98,000 | $ 224,960 | — | $ 322,960 |
| Steven M. West | $ 130,000 | $ 224,960 | — | $ 354,960 |

138. The Defendants' compensation and stock awards detailed herein were unjust and should be disgorged or returned by such Defendants because they acted in bad faith and in a disloyal manner by virtue of the conduct alleged in this complaint.

## VII. THE COMPANY HAS SUFFERED SIGNIFICANT DAMAGES

139. The Company has suffered significant harm and damages due to Defendants' wrongdoing and breaches of duty.

140. As a direct and proximate result of the Individual Defendants' conduct, the Company has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to, the amounts paid to outside lawyers, accountants, and investigators in connection with internal and external investigations into issues pertaining to the lack of diversity at Cisco, discrimination lawsuits, harassment claims, wrongful termination lawsuits, and lack of pay equity claims.

141. As recently as March 2020, Cisco agreed to pay $2,000,000 in lost wages and interest to affected employees, and pay an additional $2,750,000 over the next five years in pay-equity adjustments to its employees due to a DOL claim that *"the company*

*paid women, black and Hispanic employees less than comparable male and white employees in similar positions."*

142. Moreover, Cisco's reputation, goodwill, and market capitalization have been harmed as a result of the Individual Defendants' misconduct.

143. Further, as a direct and proximate result of the Individual Defendants' actions, Cisco has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:

(a) costs incurred from having to hire new employees, as employees have quit in protest over Defendants' misconduct and the discriminatory practices employed by Cisco;

(b) costs incurred from defending and paying settlements in discrimination lawsuits, since the Individual Defendants' wrongdoing caused discrimination to proliferate at Cisco;

(c) costs incurred from defending and settling governmental investigations into the Individual Defendants' misconduct;

(d) loss of reputation; and

(e) costs incurred from compensation and benefits paid to the Individual Defendants who have breached their duties to Cisco.

## VIII. DEMAND FUTILITY

144. Plaintiff brings this action derivatively in the right and for the benefit of Cisco to redress injuries suffered, and to be suffered, by Cisco and its stockholders as a direct result of the Officer Defendants' violations of federal securities laws and breaches of fiduciary duty.

145. Cisco is named as a nominal defendant solely in a derivative capacity.

146. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

147. At the time this action was commenced, Cisco's Board consisted of the

51

following 10 members: Defendants Burns, Bush, Capellas, Garrett, Johnson, McGeary, Robbins, Sarin, Saunders, and Su.

148. Plaintiff has not made any demand on Cisco to institute this action because such a demand would be a futile, wasteful, and useless act.

149. Under California law, demand is futile if a majority of the directors are either interested in or not independent of a person interested in the claims asserted. Further, where a board is made up of an even number of directors, a majority of directors is considered to be half the Board.

150. Based on these principles, demand is futile here if five (5) of the ten (10) directors are either interested in or not independent of a person interested in the claims asserted herein. As discussed below, demand is futile because (i) the Officer Defendants face a substantial likelihood of liability for violating the federal securities laws and breaching their duty of due care, and (ii) at least four other directors are not independent of the Officer Defendants.

A. **Demand is Futile Because All the Board Members Face a Substantial Likelihood of Liability for Breaching Their Duties of Candor and Loyalty**

151. The challenged misconduct at the heart of this case involves the direct facilitation of unlawful activity, including the Board knowingly and/or consciously presiding over the Company's discrimination against women, Blacks and other minorities at Cisco. In their capacity as corporate directors, the Board members affirmatively adopted, implemented, and/or condoned a business strategy based on Cisco's deliberate and widespread violations of law. The Board members cannot plausibly claim ignorance concerning these wide-ranging compliance failures. Indeed, the Board was specifically and uniquely accountable and responsible for the compliance failures discussed herein given that the Board was repeatedly made aware of the Company's failed internal controls and failure to comply with regulations.

152. Indeed, the lack of diversity challenged by this lawsuit pertains to the

52

Board itself, which does not contain a single African American individual. The Company's 2019 Proxy, which was approved by all the directors, stated:

> Additionally, due to the global and complex nature of our business, *the Board believes it is important to consider diversity of race, ethnicity, gender, age, education, cultural background, and professional experiences in evaluating board candidates in order to provide practical insights and diverse perspectives.*

153. All Director Defendants thus knew that the Company's Board composition was required to reflect the benefits of diversity, including diversity as to race and ethnicity.

154. Despite having actual knowledge of this requirement, all Director Defendants knew that, year after year, Cisco did not choose any racially or ethnically diverse candidates to be Board members.

155. Rather than undertake their duty to investigate all complaints and concerns related to the Company's deficient internal controls, the Board undertook minimal action. This essential "do nothing" strategy in the face of information evidencing the systematic violations of applicable laws and regulations is not a legally protected business decision and such conduct can in no way be considered a valid exercise of business judgment. A derivative claim to recoup damages for harm caused to the Company by pervasive unlawful activity represents a challenge to conduct that is outside the scope of appropriate business judgment – conduct for which the Individual Defendants should face potential personal liability. As such, the protections of the "business judgment rule" do not extend to such malfeasance. Nor can such malfeasance ever involve the "good faith" exercise of directorial authority. Accordingly, any demand on the Board to initiate this action would be futile.

156. Moreover, despite touting its signatory status on the White House Equal Pay Pledge and its participation in the Employers for Pay Parity Consortium, Cisco does not include identifiable pay parity statistics in its Proxy Statements and Annual Reports for the years 2017, 2018 and 2019.

157. The Director Defendants had actual knowledge that the summary pay parity statements included in Cisco's CSR Reports from 2018 and 2019 demonstrate that twice as many employees experienced discriminatory pay disparity in 2019 as in 2018.

158. The Director Defendants were also aware that the Caste Discrimination Lawsuit points out that pay disparity is but one symptom of a more widespread discrimination and lack of diversity problem. Cisco has not yet responded to or made a public statement regarding the Caste Discrimination Lawsuit.

159. The Board has had actual knowledge of all these facts at all relevant times.

160. Even if knowingly presiding over illegal conduct somehow falls within the ambit of the business judgment rule (which it does not), demand is also futile and excused because a majority of the members of the Board are not disinterested or independent and cannot, therefore, properly consider any demand.

161. As an initial matter, the Board has conceded in the Company's SEC filings, including its proxy statement, that Robbins is not an independent director of the Company. Specifically, Robbins is not independent and faces a substantial likelihood of liability because his principal occupation is serving as the Company's Chief Executive Officer. Moreover, a significant portion of Robbins' compensation is incentive-based, which means that he was personally incentivized to perpetuate misconduct (such as that described herein) that artificially inflates the performance of the Company. As a Cisco executive, he had exposure to and knowledge of the wrongdoing alleged, including any "red flags." Robbins cannot realistically distance himself from the misconduct alleged herein. Robbins is therefore incapable of impartially considering a demand to commence this action.

162. Furthermore, Defendants Burns, Garrett, and McGeary have all been members of the Audit Committee during the relevant period, and are conflicted from considering a demand because they each face a substantial likelihood of liability as a result of their conduct on the committee. As stated in the Proxy Statement, the Audit

54

Committee's charter imposes specific duties on members of this committee to, among other things, review the Company's practices with respect to risk assessment and risk management and meet with management and members of internal audit to discuss the Company's significant risk exposures and the steps management has taken to monitor, control and mitigate such exposures.

163. In accordance with its charter, the Audit Committee also reviews the Company's policies and practices with respect to the financial reporting and control aspects of risk management, and must review the status of risk oversight activities performed by the Board and its other committees.

164. As members of the Audit Committee, Defendants Burns, Garrett, and McGeary violated their fiduciary duties to act in good faith to address the pervasive legal violations discussed herein, including the unlawful pay equity gap and discrimination against women and minorities with respect to hiring and promotion. Accordingly, Defendants Burns, Garrett, and McGeary face a substantial likelihood of liability and cannot impartially consider a demand. Therefore, demand is excused with respect to these defendants.

165. Furthermore, the Director Defendants were on the Board during the relevant period, and thus were exposed to and had knowledge of the "red flags" alleged herein regarding unlawful discrimination and failure to abide by the Company's stated policies to promote diversity. The directors' inaction in the face of red flags subjects them to a substantial likelihood of liability for their conduct and, therefore, demand is excused.

166. The Board is likewise conflicted from and unable to pursue Cisco's claims against members of the Company's management, including Defendant Robbins. Any effort to prosecute such claims against these Defendants for their direct roles in implementing a business strategy designed to ignore or otherwise circumvent laws prohibiting discrimination would necessarily expose the Board's own culpability for the

very same conduct. In other words, given that the Board had been on notice of the wrongdoing, any effort by the Board to hold Defendants liable would surely lead these executives to defend on the ground that their own conduct was consistent with Cisco's corporate policy and practice, as established by and known to the Board.

**B.    The Entire Board Faces a Substantial Likelihood of Liability for Failure to Discharge Their Oversight Obligations in Good Faith**

167.    Under California law and Cisco's Corporate Governance Principles, the Board, as the Company's highest decision-making body, is charged with ensuring that processes are in place for ensuring legal and regulatory compliance. This is particularly true when such compliance concerns a core operation of the Company such as its employment practices. Here, the misconduct alleged was pervasive, took place over many years, and involved the Company's core business operations since the employment practices affected all Company operations. Organized and long-running violations of the law do not result from an isolated failure of oversight. The entire Board was obligated to oversee the Company's risk, including potential liability for Cisco's violations of laws regarding discrimination. At the very least, the Director Defendants consciously turned a blind eye to these pervasive violations of law, creating a substantial likelihood of liability. Accordingly, demand is excused.

168.    All of the Board's directors, at the time this action was initiated, failed to act in the face of known duties. Indeed, as explained herein, they were presented with – but consciously ignored (and/or perpetuated) – substantial "red flag" warnings that Cisco was discriminating against Blacks and other minorities with respect to hiring, promotion, and evaluation of Board candidates.  The Board also knew that *African Americans make up just 3.8% of Cisco's U.S. workforce, and there are no Blacks on the Board or among the Company's Executive Leadership team.*

169.    These and other wrongful acts have caused and will continue to cause the Company to be subjected to significant potential fines and penalties and numerous lawsuits. They have also resulted in severe harm to the Company's business reputation.

56

Since the wrongdoing and harm alleged in this Complaint flows directly from the Board's conscious decision to permit the sustained and systemic violations of law in question, the Director Defendants are incapable of exercising the independent judgment required to determine whether the initiation of an action against the Defendants is appropriate.

**C. Demand Is Futile Against a Majority of the Board Who Are Not Officer Defendants Due to a Lack of Independence, Because Robbins Controls Cisco and Its Board**

170. Because Defendant Robbins faces a substantial likelihood of liability, demand is futile if four of the remaining nine directors lack independence from Defendant Robbins. As discussed herein, Defendant Robbins has complete control over the Board with deep ties to many of the Non-Party Directors, which renders them incapable of assessing a demand.

171. Robbins is the Chairman of the Board and CEO of Cisco. Robbins dominates and controls the Board due to his ownership interests and position, and his domination of the Board. He is a member of the board of directors of BlackRock, Inc., which is the Company's second largest shareholder, owning 323,233,397 shares, or 7.6% of all outstanding shares.

172. Robbins' dual roles of Chairman & CEO, combined with his position on the board of BlackRock, which is the Company's second largest shareholder, as well as the other facts alleged herein, demonstrate that Robbins is a control person at Cisco, and that he dominates and controls the Board. As a result of Robbins' control and influence over Cisco, no director could ever be appointed or reelected to the Board over Robbins' objections. As part of his effort to control the Board, Robbins richly rewards those who demonstrate their loyalty to him, and purges those who question his decisions or otherwise threaten his leadership.

173. Further, as discussed below, each director or officer has received significant compensation while serving as a fiduciary of Cisco. Given Defendant

Robbins' prominent role in retaining the employ of these individuals, as well as their material ties to Robbins, the Individual Defendants are incapable of assessing demand as to the claims alleged herein.

## IX. CAUSES OF ACTION

### COUNT I
### Breach of Fiduciary Duty
### Against All Individual Defendants and Does 1–30

174.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

175.    The Individual Defendants and Does 1–30 owed and owe the Company fiduciary obligations.    By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

176.    The Individual Defendants and Does 1–30, and each of them, as a result of the facts alleged herein, violated and breached their fiduciary duties of candor, good faith, and loyalty.

177.    As a direct and proximate result of the Individual Defendants' and Does 1–30's breaches of their fiduciary obligations, the Company has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, defendants are liable to the Company.

### COUNT II
### Aiding and Abetting Breach of Fiduciary Duty
### Against All Individual Defendants and Does 1–30

178.    Plaintiff incorporates by reference and re-alleges each of the preceding paragraphs as if fully set forth herein.

179.    Each of the Individual Defendants aided and abetted the other Individual Defendants in breaching their fiduciary duties owed to the Company.

180.    The Individual Defendants owed the Company certain fiduciary duties as fully set out herein.  By committing the acts alleged herein, the Individual Defendants

58

breached their fiduciary duties owed to the Company.

181.   Each of the Individual Defendants colluded in or aided and abetted the other Individual Defendants' breaches of fiduciary duties, and actively and knowingly participated in the other Individual Defendants' breaches of fiduciary duties.   Each of the Individual Defendants knew about or recklessly disregarded the other Individual Defendants' breaches of fiduciary duty, which were and are continuing, as set forth in particularity herein.

182.   The Company was injured as a direct and proximate result of the aforementioned acts.

## COUNT III
### Unjust Enrichment
### Against All Individual Defendants and Does 1–30

183.   Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

184.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, the Company.

185.   During the Relevant Period, the Individual Defendants either received annual stipends, bonuses, stock options, or similar compensation from the Company that was tied to the financial performance of the Company or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

186.   Plaintiff, as shareholder and representative of the Company, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

187.   Plaintiff, on behalf of the Company, has no adequate remedy at law.

///

///

SHAREHOLDER DERIVATIVE COMPLAINT

## X. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of the Company, requests judgment and relief as follows:

A.     Against all of the Defendants, jointly and severally, and in favor of the Company for the amount of damages sustained by the Company along with pre- and post-judgment interest as allowed by law resulting from Defendants' breaches of fiduciary duty, abuse of control, gross mismanagement, and violation of the federal proxy laws;

B.     Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote of the following Corporate Governance Policies:

(1)     a proposal to require at least three current Directors to resign from the Board and setting forth a resolution to replace such Directors with two Black persons and one other minority;

(2)     a proposal to replace Chuck Robbins as Chairman with a non-executive director who is independent;

(3)     all Director Defendants named in this suit should return all their 2020 compensation received from Cisco (including any stock grants), and donate the money to an acceptable charity or organization whose efforts include the advancement of Black people and minorities in corporate America;

(4)     reformation of the annual Corporate Social Responsibility Report so that it contains particularized information about the hiring, advancement, promotion, and pay equity of all minorities at Cisco;

(5)     dedication of a $775 million fund to hire Black and minority

60

employees, promote them to more management positions at the Company, establish and maintain a mentorship program at Cisco for Black and minority employees that is committed to providing the skills and mentorship necessary to succeed in corporate America, and bolster the Conscious Culture framework, inclusive Workforce Planning, and Diverse Talent Accelerator solutions;

(6)     dedication of a $100 million fund for corporate donations to non-profits combatting racial, ethnic and gender discrimination and harassment in the workforce, and itemize donations by fund;

(7)     requirement of annual training of Cisco's entire Board and all Section 16 executive officers, which training should at a minimum focus on racial and ethnic diversity, affirmative action, anti-discrimination and anti-harassment, and other relevant topics;

(8)     immediately setting specific goals with respect to the number of Black and minority candidates to hire at the Company over the next five years, and Cisco should adopt a revised executive compensation program that makes 30% of executives' compensation tied to the achievement of the racial and ethnic diversity goals;

(9)     replacement of PricewaterhouseCoopers LLP as its auditor. Cisco is one of PwC's largest customers, and PwC has served as Cisco's auditor *since 1988*, giving rise to a cozy and clubby relationship between PwC and Cisco which is not conducive to effective auditing. The Company's compliance with its stated policies concerning the alleged commitment to racial and ethnic diversity at the top level have been abysmal to the point of being basically non-existent. The very purpose of an auditor is to assess the Company's internal controls and determine if they are functioning effectively. Rather than doing so, PwC has wrongfully and consistently given Cisco's internal controls a clean bill of health and has failed to point out the obvious -- that Cisco lacks an effective system of internal controls to

61

ensure that the Company is not discriminating against minorities and is complying with its stated goals and initiatives regarding the promotion of non-gender based diversity and the avoidance of discrimination and harassment;

(10)    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater non-controlling shareholder input into the policies and guidelines of the Board;

(11)    a proposal to strengthen Cisco's oversight of its procedures regarding the termination of employees, executives, and Board members accused of discrimination;

(12)    a proposal to strengthen internal controls concerning discrimination;

(13)    a proposal to eliminate the use of Non-Disclosure Agreements at the Company so that current and former employees can report any and all instances of suspected discrimination without threat of legal action; and

(14)    a proposal to eliminate the use of mandatory arbitration for employee disputes and claims of wrongful termination and discrimination.

C.    Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of Defendants' trading activities or their other assets so as to assure that Plaintiff on behalf of Cisco has an effective remedy;

D.    Awarding to Cisco restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by Defendants;

E.    Awarding punitive damages at the maximum amount permitted by law;

F.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' fees, experts' fees, costs, and expenses; and

G. Granting such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of Cisco, hereby demands a trial by jury of all issues that are subject to adjudication by a trier of fact.

Dated: September 24, 2020

Respectfully submitted,

BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr. (SBN 175783)
Anne B. Beste (SBN 326881)
Albert Y. Chang (SBN 296065)
Yury A. Kolesnikov (SBN 271173)

s/ Francis A. Bottini, Jr.
Francis A. Bottini, Jr.

7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone: (858) 914-2001
Facsimile: (858) 914-2002
Email: fbottini@bottinilaw.com
abeste@bottinilaw.com
achang@bottinilaw.com
ykolesnikov@bottinilaw.com

*Attorneys for Plaintiff Edward Sanchez*

63

Superior Court of California,
County of Santa Clara
191 North First Street
San Jose, CA 95113

Revised January 21, 2020

**Complex Civil Guidelines**

## GUIDELINES AND PROTOCOLS

## COMPLEX CIVIL LITIGATION DEPARTMENT

Welcome to the Complex Civil Litigation Departments of the Superior Court of California, County of Santa Clara. Ours is one of few Superior Courts selected by the California Judicial Council where case management principles designed to reduce the time and expense normally associated with complex civil litigation cases have been employed.

Counsel are expected to be familiar with the applicable *California Rules of Court*, *Local Rules – Superior Court of California, County of Santa Clara*, *The Santa Clara County Bar Association Code of Professionalism*, and the *Deskbook on the Management of Complex Civil Litigation*. Familiarity with these guidelines and protocols will answer common procedural questions and should assist you in your appearances in these Departments. ***Note: These Guidelines and Protocols are revised from previous versions. Your thoughts and suggestions are always welcome. Significant practice highlights include:***

*The website for the Complex Departments is now integrated into the Court's site, www.scscourt.org.*

*Tentative rulings on motions of all types are posted online by 2:00 p.m. the day before the hearing, and, unless an objection is properly raised by 4:00 p.m. the day before the hearing, the ruling will automatically become the Court's order the next day. For specific information, go to: http://www.scscourt.org/online_services/tentatives/tentative_rulings.shtml and select the appropriate department.*

*Ex parte hearings require advance reservation with the Coordinator. Letter briefs are not acceptable.*

*Case management conference statements are to be in a combined format; see VII. 3.*

*No discovery motions may be filed until the parties have meaningfully met and conferred AND met with the Court for a face-to-face Informal Discovery Conference.*

*The Court requires detailed JOINT pre-trial statements in advance of a pre-trial conference where counsel are expected to make concrete suggestions as to efficient trial management; see XI.*

### Complex Civil Guidelines

---

> # PLAINTIFF MUST SERVE A COPY OF THESE GUIDELINES
> # WITH THE SUMMONS AND COMPLAINT.

## TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | CONTACT INFORMATION | 3 |
| II. | INTRODUCTION | 3 |
| III. | COURTROOM DEMEANOR, CONDUCT AND ETIQUETTE | 4 |
| IV. | GENERAL MATTERS | 5 |
| V. | EX PARTE APPLICATIONS | 5 |
| VI. | DISCOVERY | 6 |
| VII. | LAW AND MOTION | 6 |
| VIII. | CASE MANAGEMENT CONFERENCE | 7 |
| IX. | CASE MANAGEMENT AND REFERENCE ORDERS | 8 |
| X. | MANDATORY SETTLEMENT CONFERENCES (MSC) | 8 |
| XI. | MINI-TRIALS | 9 |
| XII. | PRE-TRIAL CONFERENCE | 9 |
| XIII. | TRIALS - GENERALLY | 13 |
| XIV. | TRIAL EXHIBITS | 18 |
| CURRICULUM VITAE FOR JUDGE BRIAN C. WALSH | | 20 |
| CURRICULUM VITAE FOR JUDGE PATRICIA M. LUCAS | | 22 |

**Complex Civil Guidelines**

I.    CONTACT INFORMATION

Departments 1 and 3 –        Downtown Superior Courthouse, 191 N 1st Street,
                             San Jose, CA 95113.

Department 1:

| Judge | Hon. Brian C. Walsh | 408-882-2110 |
| Courtroom Clerk | Jee Jee Vizconde | 408-882-2113 |
| Bailiff and Deputy Sheriff | Frankie Taranto | 408-882-2111 |

Department 3:

| Judge | Hon. Patricia M. Lucas | 408-882-2130 |
| Courtroom Clerk | Naomi Matautia | 408-882-2133 |
| Bailiff and Deputy Sheriff | Tina Harrell | 408-882-2131 |

| Coordinator for Complex | Rowena Walker | 408-882-2286 | rwalker@scscourt.org |

E-Filing Web Site:         http://www.scscourt.org/forms_and_filing/efiling.shtml

II.   INTRODUCTION

Complex cases suitable for assignment to the Complex Civil Litigation Department are defined in Rule 3.400, California Rules of Court ("Rules" or CRC). Cases will be assigned to the Complex Civil Litigation Department, **for all purposes, including discovery and trial**, by the Court's own motion, or on motion of any of the parties, pursuant to the procedures specified in Rule 3.400. Motions for complexity determination shall be heard in the Complex Civil Litigation Department. It is within the Court's discretion to accept or reject a case for complex designation.

In general, cases assigned to the Complex Civil Litigation Department will be managed in accordance with the principles set forth in the *Deskbook on the Management of Complex Civil Litigation* ("Deskbook").

**Complex Civil Guidelines**

## III. COURTROOM DEMEANOR, CONDUCT AND ETIQUETTE

1. The Court expects formality, civility and proper decorum at all times. Witnesses and parties are to be addressed and referred to by their surnames. COURTESY AND RESPECT TOWARDS EVERYONE IN THE COURTROOM IS REQUIRED. Advise all witnesses and parties to observe appropriate courtroom demeanor and punctuality. The civil and courteous treatment of courtroom staff and opposing counsel is a paramount professional obligation of counsel.

The Santa Clara County Superior Court, by standing order, has adopted the Code of Professionalism of the Santa Clara County Bar Association. Counsel are expected to be familiar with the Code and use it as a guide for appropriate attorney behavior.

2. All pagers, cell phones and other audible electronic devices must be TURNED OFF while in the courtroom whether or not court is in session.

3. Do not approach the clerk or reporter while court is in session for any reason.

4. Objections, statements and arguments must be addressed to the Court rather than opposing counsel. Counsel may speak from the lectern (if present) or the counsel table. Counsel must stand when objecting or addressing the Court. Counsel may approach any witnesses as necessary only with leave of Court.

5. At the end of each day, counsel must clear work areas including the area in the rear of the courtroom.

6. Use of the department's copier or telephone requires the Court's permission.

7. It is counsel's responsibility to note the date and time set for any future hearing. Hearing dates are set by contacting the Coordinator.

8. Courtroom staff will not make copies at counsel's request unless directed to do so by the Court. Copy work completed by courtroom staff is subject to the current per-page copy fee.

9. If a peremptory challenge or challenge for cause is upheld, the case will be referred to the Civil Supervising Judge for reassignment.

## Complex Civil Guidelines

## IV. GENERAL MATTERS

1. The Court expects all counsel to maintain regular communication with each other regarding hearing dates, progress of the case, and settlement possibilities. A condition of remaining in a complex department is that counsel will behave toward all counsel and other participants with civility, courtesy and professionalism, both in and out of court. Meeting and conferring with opposing counsel on both procedural issues as well as substantive issues is mandated.

2. Continuances of hearing or trial dates are discouraged but may be necessary from time to time. Continuances of hearings and trial dates by stipulation are not permitted without prior approval of the Court, and only to a date pre-approved by the Court. Please call the Coordinator for available dates before contacting other counsel. If preliminary approval is given, a written stipulation must be provided before the hearing or trial date. Faxed signatures on stipulations are permitted.

3. In the event a case settles before a court hearing or trial date, parties must telephonically notify the Court as soon as the disposition is agreed upon and must file with the Complex Litigation Department either a Notice of Settlement, Request for Dismissal, a Stipulation for Entry of Judgment or a Judgment on Stipulation that is ready for the Court's signature. If the applicable document is not ready, counsel must appear at the time scheduled for hearing and recite the settlement for the record.

4. Cross-complainants must serve a copy of these guidelines upon any new parties and give notice of any scheduled hearings and depositions at the time the cross-complaint is served.

5. All actions classified as complex or provisionally complex are subject to the Court's Electronic Filing and Service Standing Order, unless exempted by order of the Court for good cause. Further information is posted on the Court's website at *http://www.scscourt.org/forms_and_filing/efiling.shtml* .

## V.    EX PARTE APPLICATIONS

1. Ex parte appearances are discouraged except in unusual situations. Hearing dates must be coordinated with the Complex Coordinator. Strict compliance with CRC Rules 3.1200-3.1207 is required. In addition, the ex parte application and all supporting papers, including any proposed pleading, motion or order shall be electronically submitted to the Court's website by noon the Court day before the scheduled ex parte hearing date.

2. The Court is eager to assist counsel when specific problems arise that may not require a formal motion. To arrange a conference with the Court when all counsel agree to the advisability of such a discussion, please contact the Coordinator to reserve a time for the conference. In these

**Complex Civil Guidelines**

instances "letter briefs" are not acceptable, but briefs on court pleading paper not exceeding 3 pages may be submitted.

3.   Though the Court prefers personal appearances by counsel, counsel may appear by telephone, with the Court's prior permission, at counsel's expense.

## VI. DISCOVERY

1.   The Court believes in open discovery in accordance with the law, but expects counsel to refrain from engaging in excessive and abusive discovery.

2.   Discovery meet and confer obligations require an in-person conference between counsel. If a resolution is not reached, parties are required to meet and confer in person with the Court for all discovery-related hearings **before filing any discovery motion, unless otherwise authorized by the Court.** Each side must serve and lodge a short brief, **limited to no more than 3 pages,** two court days in advance of the meeting. To schedule an informal discovery conference (IDC) with the Court, please contact the Coordinator.

3.   **Any dates given by the Court relating to this IDC process have no impact on statutory deadlines for filing motions or any other papers, including, but not limited to, the 45-day deadline for filing a motion to compel further responses. The party who files a discovery motion must address the motion's timeliness in its moving papers.**

4.   Counsel and/or parties with full authority to resolve the discovery issue(s) must personally attend the IDC unless excused by the court.

## VII.   LAW AND MOTION

1.   Law and Motion matters are generally heard Fridays at 9:00 a.m.

2.   Counsel must first clear the hearing date with the other parties before contacting the Coordinator. You must provide the Court with the name of the case, the case number, type of hearing, hearing date requested, and name and telephone number of the filing attorney.

3.   Before the hearing of **any** motion, petition or application, all counsel and parties representing themselves shall communicate in a good faith effort to eliminate the necessity of the hearing.

4.   **The Court values the importance of the training of the next generation of trial lawyers, which must include substantive speaking opportunities in court. The Court strongly**

Superior Court of California,
County of Santa Clara
191 North First Street
San Jose, CA 95113

Revised January 21, 2020

**Complex Civil Guidelines**

encourages the parties and senior attorneys to allow the participation of junior lawyers in all court proceedings, particularly in arguing motions where the junior lawyer drafted or contributed significantly to the motion or opposition.

5.   Motions or applications to seal must be heard no later than any motion relying on the materials for which sealing is sought. Upon denial of a motion or application to seal, the moving party must notify the Court that the materials are to be filed unsealed (CRC Rule 2.551(b)(b)) or refrain from relying on the materials, which will not be part of the record.

6.   When the Court sustains a demurrer or grants a motion to strike with leave to amend and an amended pleading is filed, the plaintiff or cross-complainant shall file with its opposition to any successive demurrer or motion to strike a redline comparing the amended pleading to the previous version of the pleading.

7.   Counsel for moving parties must notify the Court as soon as possible regarding any matter to be taken off calendar or continued.  Notice of continuances of hearings must be provided by the moving party.

## VIII.   CASE MANAGEMENT CONFERENCE

1.   The first case management conference is generally scheduled one hundred twenty (120) days after the action is filed.  Plaintiff is required to give notice of this conference date to all other parties.

2.   Case Management Conferences are generally heard Fridays at 10:00 a.m. and are scheduled as necessary to monitor the progress of the case and to assist counsel and the parties as the matter progresses.  The parties should expect the Court to schedule a status conference approximately every 120 days.

3.   Judicial Council Form CM-110, Civil Case Management Statement (required by CRC 3.725(c)), is not well-suited for complex cases. Instead, the parties shall file a joint case management statement no later than five calendar days prior to the hearing for each conference addressing the following subjects:

(a) a brief objective summary of the case,
(b) a summary of any orders from prior case management conferences and the progress of the parties' compliance with said orders,
(c) significant procedural and practical problems which may likely be encountered,
(d) suggestions for efficient management, including a proposed timeline of key events, and
(e) any other special consideration to assist the Court in determining an effective case management plan.

Superior Court of California,
County of Santa Clara
191 North First Street
San Jose, CA 95113

Revised January 21, 2020

**Complex Civil Guidelines**

A status conference statement may be filed as an alternative to the case management statement when appropriate. A status conference statement is generally less detailed than a case management statement and is to be used to advise the Court of progress or developments in the case which have occurred since the last review hearing.

IX. CASE MANAGEMENT AND REFERENCE ORDERS

1. Case Management Orders are not required in all cases, but may be helpful in cases where the sequencing and timing of key events are necessary in the management of the litigation and preparation of the case for trial. However, even if a case management order is not necessary in a particular case, all complex cases must be managed by counsel, or the court, or both.

2. Mediation and Reference matters should not commence until <u>all</u> parties are before the Court but not later than six months after the original complaint was filed, except for good cause.

3. Mediation and Reference matters should be concluded 12 months after their initiation (approximately 18 months after the original complaint was filed), except for good cause.

4. Brevity in drafting the Order may help focus your case and assist in reaching the desired goal (i.e., early informed resolution of your case in a cost-effective manner).

5. After a date is scheduled with the Court, it may not be continued by stipulation of the parties without the Court's consent.

X. MANDATORY SETTLEMENT CONFERENCES (MSC)

1. If there is an objection to the trial judge's participation in the mandatory settlement conference, counsel must advise the Court as soon as possible, and in no event, later than the date the MSC is set. No case will be tried before a good faith effort is made to settle. Mandatory settlement conferences set on the court's calendar are typically set at the time the trial is set, and generally, the final mandatory settlement conference takes place a week to two weeks before the first day of trial, typically on a Wednesday.

2. Trial counsel, parties and persons with full authority to settle the case must personally attend unless excused by the Court. If insurance coverage is available to satisfy the plaintiff's settlement demand and a representative of defendant's insurer with full settlement authority attends the mandatory settlement conference with defendant's trial counsel, named defendants need not attend unless their personal consent is necessary to settle the case. Named defendants must also personally attend the mandatory settlement conference when (a) there is an insurance coverage

Superior Court of California,
County of Santa Clara
191 North First Street
San Jose, CA 95113

Revised January 21, 2020

**Complex Civil Guidelines**

dispute; (b) plaintiff seeks to recover damages not covered by insurance; or (c) plaintiff's demand exceeds insurance policy limits. Failure to appear will result in the imposition of sanctions. Settlement Conference Statements must be filed at least five (5) court days before the scheduled conference (Rule 3.1380).

3. Any request for a waiver of the requirement to personally appear at the MSC, whether conducted by the Court or a special master, must be made by written application to the Court.

## XI. MINI-TRIALS

There may be a pivotal issue, such as a special defense or evidentiary ruling, upon which the rest of the case depends. If counsel agree, the Court will set aside time before or during the trial to hear mini-trials on such issues. Time will be appropriately limited. Briefs and factual stipulations must be submitted in advance. Limited testimony may be taken, for example, as in an Evidence Code § 402 situation. Contact the Coordinator to schedule a date and submit a stipulation signed by all counsel.

## XII. PRE-TRIAL CONFERENCE

There will be a detailed pre-trial conference 10-15 days before trial to discuss procedural issues and preliminary matters in order to make the trial process as predictable and smooth as possible.

The conference may be a time for the Court to discuss trial evidence presentation and use of audio-visual equipment. The conference is not for the purpose of hearing motions in limine. An example of an issue for the conference: Product liability case in which the manner of presenting the underlying case is of concern. Will the Court allow counsel to read the transcript into the record? Live testimony? A combination of transcript and live testimony? Is a trial by jury requested?

At least 10 days before the pretrial conference, counsel shall meet and confer and execute necessary documents listed below. Counsel shall meet in person at a mutually agreeable time and location.

At the meet and confer, the parties shall:

## Complex Civil Guidelines

1. Prepare a **Joint Statement of the Case.**

2. Prepare a **Joint Witness List**, excluding impeachment or rebuttal witnesses, with accurate time estimates.

Witness lists should not be exaggerated. Only witnesses that a party expects to actually call should be listed, with a brief synopsis of the proposed testimony. In addition to the list contained in the statements, each list should also be prepared in the form attached as follows. Witnesses should be listed last name first. Titles (e.g. Dr., Officer) should be placed after the comma following the last name. This is so that lists can be sorted correctly.

As noted above, Counsel should include in their witness list the amount of time they expect to spend on direct examination of each witness. The amount of time should be stated in minutes (*not* days or hours). Counsel must also be prepared to state at the conference how much time they will require for cross-examination of each witness identified on the other party's list.

At the conference the Court will make separate arrangements for the preparation of a joint list, for jury selection purposes, of possible witnesses and persons or entities who might otherwise be mentioned at trial.

Format for Witness Lists

*Plaintiffs' List*

| Witness | Party (P or D) | Direct (min.) | Cross (min.) | Redirect (min.) | Total | Subject |
|---|---|---|---|---|---|---|
| Smith, John | P | 20 | 30 | 5 | 55 | Formation of contract |
| Brown, Nancy | P | 15 | 20 | 5 | 40 | Breach of contract |
| White, Ron | P | 70 | 10 | 15 | 95 | Damages |
| Black, Peter | P | 60 | 30 | 15 | 105 | Formation of contract |
| | P | 120 | 100 | 30 | 250 | Damages |

**Complex Civil Guidelines**

| Garcia, Dr. Ruth | | | | | | |
|---|---|---|---|---|---|---|
| Rogers, Officer Ted | P | 60 | 30 | 10 | 100 | Arrest of Susan Petersen |

## Complex Civil Guidelines

*Defendant's List*

| Witness | Party (P or D) | Direct (min.) | Cross (min.) | Redirect (min.) | Total | Subject |
|---------|----------------|---------------|--------------|-----------------|-------|---------|
| Doe, Edward | D | 20 | 10 | 5 | 35 | Formation of contract |
| Chang, Sam | D | 75 | 30 | 15 | 120 | Damages |
| Martin, Dr. Eric | D | 120 | 60 | 30 | 210 | Damages |

3. Exchange **exhibits** and inspect photos and diagrams (to be submitted on the date of trial), excluding those contemplated to be used for impeachment or rebuttal. **Stipulate to all facts amenable to stipulation.**

4. Prepare a **Joint List of Controverted Issues**. If all the parties fail to agree to an issue as controverted or uncontroverted, then the issue is controverted. (Required for both jury and non-jury trials).

5. Exchange all **motions** in limine.

6. Prepare *voir dire* **questions** for the Court to include when examining the panel.

7. Execute the **Statement of Compliance** indicating counsel has complied with the Local Rules and these Guidelines.

8. Prepare joint proposed **jury instructions** (CACI only) and verdict forms, and exchange disputed instructions.

The above items, including opposition to motions in limine, trial briefs and the Statement of Compliance signed by all counsel, shall be submitted to the Complex Civil Litigation Coordinator **no later than noon on the 1st court day before the date set for trial, or such other time and date set by the Court.**

## Complex Civil Guidelines

XIII.   TRIALS - GENERALLY

1.  **General Matters – the following applies to all trials (jury and non-jury):**

   a.   Trials generally will proceed four days a week as follows:  Monday through Thursday (9:00 a.m. to 4:30 p.m.).  The Court will provide the parties, generally at the conclusion of the Mandatory Settlement Conference, a proposed trial schedule.

   b.   Jury deliberations will proceed five days a week, from 9:00 a.m. to 4:30 p.m.

   c.   Trial attorneys should be in the courtroom 30 minutes prior to the start of each morning session, unless another time is agreed upon by the Court.  Counsel should expect that the court will take appropriate action if counsel is late for any appearance and does not have a justification for a late appearance.

   d.   Before rearranging tables or other courtroom furniture, or installing equipment such as projectors or screens, permission must first be obtained from the bailiff or the Court.

   e.   Unless the Court expressly advises otherwise, counsel may not approach a witness who is testifying to hand the witness exhibits, or to help the witness locate portions thereof, without first obtaining the Court's permission.

   f.   Counsel must advise opposing counsel and the Court of the identity of each witness intended to be called by 4:30 p.m. the day preceding the time for the witness or witnesses to testify.

   g.   Counsel presenting their case shall be expected to have witnesses ready to call through at least 4:30 p.m., and may be deemed to have rested their case if they are not prepared to proceed.  Counsel shall advise the Court immediately of any circumstances which may prompt a request for a modification of the established trial schedule.

   h.   Counsel should advise the Court at the outset of the proceedings, or as soon as the issue becomes apparent, of any legal issues or evidentiary matters that counsel anticipate will require extended time for consideration or hearing outside the presence of the jury.

   i.   If during the course of trial, counsel wish to discuss a matter with the Court and opposing counsel outside of the presence of the jury, counsel MUST advise the Court of this request at the conclusion of the preceding court session and NOT immediately before proceedings are scheduled to resume.

## Complex Civil Guidelines

j. The amount of jury fees required to be posted in advance of a jury trial is $150.00. CCP §631(b). If a case settles after jury fees have been deposited, the jury fees will not be returned unless the Court is notified of the settlement by 2:00 p.m. on the court day preceding the trial date for which the deposit was made.

k. The court does not provide court reporters in complex civil cases. See General Local Rule 7. If one or more parties privately arrange for court reporter services, the failure of such court reporter to appear will not be grounds for continuing or delaying a trial or other proceedings.

l. Counsel must confer in advance of the trial, attempt to stipulate on as many issues and facts as possible, and reduce all stipulations to writing. The written stipulation is filed and during jury trials is read aloud into the record.

m. **The Court strongly encourages the parties and senior attorneys to permit junior lawyers to have an important role at trial, including the examination of witnesses.**

2. **Documents**

Unless the case was settled at the Mandatory Settlement Conference or dismissed in full prior thereto, or unless otherwise ordered by the Court, the following items must be lodged in the department of the trial judge or, if none, with the Complex Civil Coordinator, and served on all other parties by noon on the last court day before the date set for trial:

(1) all in limine motions and a <u>list</u> of the in limine motions;

(2) exhibit lists/indices, except impeachment exhibits;

(3) witness lists, except impeachment witnesses, and unusual scheduling problems; each witness listed shall include a succinct (no more than one or two sentences) statement of the general subject matter of the witness' testimony and an estimate of the time that will be required for the direct examination of each such witness;

(4) jury instruction requests, except for instructions that cannot reasonably be anticipated prior to trial;

(5) proposed special verdicts;

**Complex Civil Guidelines**

(6) any stipulations on factual or legal issues;

(7) a concise, non-argumentative statement of the case to be read to the jury in jury trials;

(8) trial briefs;

(9) the original of all deposition transcripts to be used during the course of the trial. If counsel anticipates reading from the deposition transcript for any purpose other than impeachment, counsel must deliver to opposing counsel a written specification of the pages and lines proposed to be read.

An extra copy of all the above documents (except deposition transcripts) shall be delivered to the courtroom clerk on the morning of the trial for use by the clerk.

Counsel seeking to display to the jury any exhibit which required time and equipment to observe, such as slides, transparencies, movies, videotapes and audiotapes, MUST make such exhibit available to opposing counsel for review prior to commencement of the session of court at which the exhibit will be used. Proceedings will not be delayed to permit such a review if the review has not occurred by the time court is scheduled to begin.

3. **Technology**

Counsel must meet and confer regarding the use of computers, projectors, screens and other forms of equipment for showing evidence to the jury or Court. Counsel must confer with court staff regarding the placement and use of any such equipment.

4. **Stipulations**

Prior to the commencement of trial, all counsel will be requested to stipulate:

1. At the commencement of each session of the Court, all parties, attorneys and jurors are present unless otherwise indicated.

2. After the first occasion on which the jury has been admonished not to discuss or prejudge the case in conformity with CCP § 611, the jury will be deemed to have been so admonished at every subsequent recess or separation without the need for further admonition; and

3. Reporting of juror voir dire and jury instructions are waived.

Superior Court of California,
County of Santa Clara
191 North First Street
San Jose, CA 95113

Revised January 21, 2020

**Complex Civil Guidelines**

5. **Opening and Closing Arguments**

   a.  Counsel should avoid discussing routine matters of court procedure, such as the sequence of trial, in opening statements and closing arguments. These matters will be covered by the Court and need not be repeated by counsel.

   b.  Do not display charts, diagrams or proposed exhibits to the jury until they have been shown to opposing counsel outside of the presence of the jury. If opposing counsel indicates no objection, the exhibits or other object may be displayed to the jury without first requesting Court approval. If opposing counsel objects, the exhibit or object may not be displayed without Court approval, which must be requested outside the presence of the jury.

6. **Examination of Witnesses**

   a.  Objections: Counsel should only state the legal ground(s) of objection and, unless the Court specifically requests explanation or argument, should refrain from argument, elaboration, or any other form of extended objection-making. Counsel may request permission to approach the side bar to present argument, but should not approach unless and until the Court grants the request.

   b.  When calling a witness to testify under Evidence Code section 776, do not announce in the presence of the jury that the witness being called under this provision or as a "hostile" or "adverse" witness. Simply proceed with the examination of the witness; the Court will rule upon the applicability of section 776 only if such a ruling is required by an objection asserted by opposing counsel.

   c.  Do not propose a stipulation to opposing counsel in the hearing of the jury unless there is prior agreement of counsel.

7. **Transcripts**

   a.  If counsel anticipates requesting a transcript of the testimony of any witness or other proceedings during the course of trial, arrangements should be made with the

Superior Court of California,
County of Santa Clara
191 North First Street
San Jose, CA 95113

Revised January 21, 2020

**Complex Civil Guidelines**

court reporter <u>in advance</u> so that arrangements can be made to obtain a second court reporter if necessary.

b.   If counsel requests any court reporter to prepare a transcript of any portion of the proceedings, counsel MUST contemporaneously advise opposing counsel of the request and of the precise portions that will be transcribed.

## 8. Jury Trials

a.   Motions in limine and other trial-related preliminary motions (such as Evidence Code § 402) must be submitted in writing before answering ready. Motions in limine may be ruled on by the Court without hearing. Such motions should be brief and should address specific subject matter. See *Amtower v. Photon Dynamics, Inc.*, (2008) 158 Cal.App.4th 1582.

b.   CACI instructions are to be used. Submit proposed instructions in Word format. When reasonably possible, mark up the official version rather than retyping so the changes are apparent to the Court and other counsel. The Court may send at least 4 "clean" sets of instructions provided by counsel into the jury room. "Clean" means just the text of the instruction, as corrected. Plaintiff has the primary, but not exclusive, responsibility to provide the "clean" sets, in binders.

c.   Counsel should consider stipulating that the determination as to which members of the trial jury shall be alternates will be determined by random draw of names immediately before deliberations commence. If counsel so stipulate, the size of the panel selected at the outset of trial will be 12 plus the number of alternates expected to be needed, with the peremptory challenges allotted to each side increased by the number of jurors in excess of 12.

d.   <u>Hardship Requests</u> - Requests by members of the panel to be excused on the ground of undue hardship will be considered by the court prior to beginning voir dire examination.

e.   Jury selection proceeds generally under the "6 pack" method, modified to fit the case. Court and counsel will work out the management of voir dire in accordance with CCP § 225.5 to fit the circumstances of the case. Counsel may submit specific juror questions for the Court to consider asking during voir dire.

f.   Voir dire examination will initially be directed to 18 or more members of the jury panel seated in the jury box. Any of these 18 or more panel members excused for cause will be replaced by additional panel members before peremptory challenges begin. Peremptory challenges will then proceed, directed to the first 12 panel members, who will be replaced by the next six panel members in order as any of

Superior Court of California,
County of Santa Clara
191 North First Street
San Jose, CA 95113

Revised January 21, 2020

**Complex Civil Guidelines**

the 12 are peremptorily challenged. The peremptory challenges will continue until the panel seated in the jury box is reduced to 11 members, at which time additional panel members (normally an additional seven) will be selected and examined prior to resuming peremptory challenges. Whenever there are successive passes from all parties who have not exhausted their challenges, or all parties exhaust their challenges, the jury has been selected and will be sworn. The same process will then continue for the selection of alternate jurors.

g.    All challenges for cause will be heard out of the hearing of the jury panel.

h.    The Court will initiate voir dire examination. Upon completion of the judge's examination, Counsel will have the right to examine the jurors within reasonable time limits prescribed by the trial judge.

i.    The Court preinstructs the jury once it is empaneled. CACI Instructions relating to the basic responsibilities of the jurors, management of evidence and the like will be given and, in most cases, repeated at the close of trial.

j.    Objections of any kind are to be addressed to the Court (not to other counsel) with a concise statement of the legal grounds. Argument on the objection without invitation by the Court is not permitted. Advise the Court if argument is necessary for the record.

k.    Make no references to charts, models, blowups or other demonstrative evidence in front of the jury unless: (a) it is in evidence; (b) counsel have previously stipulated the item is in evidence; or (c) you have leave of Court to use the reference.

## XIV.  TRIAL EXHIBITS

1.    **Introduction**

a.  The electronic representations of such exhibits may be presented to the Jury/Court as substitutes for the exhibits themselves. Counsel should keep in mind that one of the purposed of the complex project is to enhance the orderly presentation of evidence to the fact finder, and to maintain the record for potential post trial proceedings.

b.  Exhibits may be in either electronic or physical form. Physical exhibits are not required to be presented in a digitized format. However, at the conclusion of trial the court may order that a photo be substituted and stored electronically in lieu of the physical evidence.

c.  Parties must exchange exhibits excluding documents for bona fide impeachment at the Pre-Trial Meet and Confer. Each counsel must provide the Court with an EXHIBIT LIST

Superior Court of California,
County of Santa Clara
191 North First Street
San Jose, CA 95113

Revised January 21, 2020

**Complex Civil Guidelines**

describing each exhibit, indicating whether the exhibit is to be admitted into evidence by stipulation.

d. Counsel must submit to the Clerk original negotiable instruments for cancellation pursuant to Rule 3.1806, unless otherwise ordered by the Court.

2. **Submission of Exhibits**

a. Counsel must provide the Court with the exhibits, plus one copy. Exhibits will be marked by the Clerk, as they are identified, in chronological order. Exhibits shall not be pre-marked by counsel.

b. Enlargements and transparencies normally will not be admitted into evidence. Any large exhibit or transparency should be accompanied by an 8½ x 11 version to which the exhibit tag is attached. Models, etc. should be photographed if proposed as exhibits. Be sure to discuss evidentiary issues of this nature with opposing counsel.

c. Interrogatories and Requests for Admissions which are expected to be used at trial must be extracted and lodged with the Court, and a copy given to counsel, at the appropriate time. In jury trials, questions and answers must be read into the record, subject to proper objections. The extracts may be submitted as exhibits in a Court trial. In no case will entire sets of written discovery documents be lodged or received.

d. Before trial commences, counsel will be asked to sign a stipulation for the return and maintenance of exhibits when the trial is completed. Plaintiff will maintain joint exhibits, unless otherwise stipulated.

3. **Use of Deposition Transcripts**

a. Deposition transcripts which are expected to be used at trial must be lodged with the Court on the first day of trial. Pertinent provisions must be read into the record in jury trials, subject to proper objections. In Court trials, extracts may be submitted and marked as exhibits. In no case will an entire transcript be received.

Superior Court of California,
County of Santa Clara
191 North First Street
San Jose, CA 95113

Revised January 21, 2020

**Complex Civil Guidelines**

## CURRICULUM VITAE FOR JUDGE BRIAN C. WALSH

**Judge Brian C. Walsh**
**Superior Court of California**
**County of Santa Clara**
**191 North First Street**
**San Jose, California 95113**
**Department 1**
**408-882-2110**


## JUDICIAL CAREER:

**Appointed to the Superior Court December 15, 2000**
**--Elected to 6-year terms (unopposed): 2002, 2008, 2014**
**Complex Civil Litigation, 2017-**
**Presiding Judge, 2013-14**
**Assistant Presiding Judge, 2011-12**
**Civil Trials, 2003-04, 2007-09, 2011-12, 2015-16**
**Family Law, 2009-10**
**Felony Trials, 2005-07**
**Appellate Division, 2005**
**Supervisor, Misdemeanor Direct Calendars, 2002-03**
**Misdemeanor Direct Calendar, 2001**

**6th DCA, Pro Tem Justice:**
**June 1-November 30, 2016**
**June 1-September 30, 2015**
**July 1-December 31, 2011**
**May 1, 2004-January 17, 2005**


**California State-Federal Judicial Council, 2003-present**
**Language Access Plan Implementation Task Force, 2015-present**
**Chair, Trial Court Presiding Judges' Advisory Committee, 2013-2014**
**Member, Judicial Council of California, 2013-2014**
**Chair, Task Force on Trial Court Fiscal Accountability 2013-2014**
**Supreme Court Judicial Ethics Advisory Comm., 2002-2013**
**Financial Accountability & Efficiency Comm. ("A & E"), 2011-2013**
**Trial Court Budget Advisory Committee, 2013-2014**
**--Funding Methodology (WAFM) Subcommittee, 2012-2014**

## Complex Civil Guidelines

Judicial Branch Budget Advisory Committee, 2002-03
Chief Justice Task Force on ACA 1 (Judicial Elections), 2001
California Judges' Association, 2000-present
State Bar Attorney Civility Task force, 2006-08
State Bar Task Force on Support for Legal Services, 2006-08


2016 State Bar of California Professional Responsibility Award
2014 Outstanding Jurist Award, Santa Clara County Bar Association
2012 Trial Judge of the Year, Santa Clara County Trial Lawyers
2002 Salsman Award: Contributions to Community/Profession


**EDUCATION:**

Boalt Hall School of Law
University of California at Berkeley
J.D., 1972

University of Notre Dame
B.A., 1969


Date of Birth: November 11, 1947 (San Jose, California)

**Complex Civil Guidelines**

## CURRICULUM VITAE JUDGE PATRICIA M. LUCAS

Judge Patricia M. Lucas
Superior Court of California
County of Santa Clara
191 North First Street
San Jose, California 95113
Department 3
408-882-2130

**JUDICIAL CAREER:**

Appointed to the Superior Court December 20, 2002
Elected to 6-year terms (unopposed): 2004, 2010, 2016
Complex Civil Litigation, 2020-
Presiding Judge, 2017-18
Assistant Presiding Judge, 2015-16
Civil Trials, 2013, 2016
Civil Pretrial Case Management, 2011-12, 2014-15
Civil Discovery/Trials, 2004
Supervising Judge, Civil Division, 2014-15
Family Law, 2005-08
Supervising Judge, Family Division, 2006-08
Appellate Division, 2004, 2013
Presiding Judge, Appellate Division, 2013
Criminal Trials, 2003, 2009-10
Temporary assignment on the Sixth District Court of Appeal, 2011

Chair, Trial Court Presiding Judges Advisory Committee, 2017-18
Member, Judicial Council of California, 2017-18
B. E. Witkin Judicial College of California: Dean, 2017-18
    Associate dean, 2015-16
    Faculty, 2004 to present
    Seminar leader, 2005-06 and 2009-2014
Faculty/Seminar Leader, New Judge Orientation, 2005 to present
Faculty, CJER Civil Law Institute, 2006 to present
Member, CJER New Judge Educ./Judicial College Steering Committee;
    New Judge Orientation Working Group;
    Experienced Judge Working Group (chair)
Member, CJER Governing Committee, 2005, advisory member, 2015-18
Member, Judicial Council Civil & Small Claims Advisory Committee,

## Complex Civil Guidelines

2006-2015 (chair, 2013-15)
Member and vice-chair, Judicial Council Court Facilities Advisory
Committee, 2011 to present
Member, Elkins Family Law Task Force and Implementation Task Force,
2008-12
Instructor, National Institute for Trial Advocacy, 1990 to present

Private practice, complex civil litigation, 1979-2003
University of California, Berkeley, J.D.
Rice University, B.A.

# CIVIL LAWSUIT NOTICE

**20CV370823**

*Superior Court of California, County of Santa Clara*
*191 North First St., San José, CA 95113*

CASE NUMBER: _____

## PLEASE READ THIS ENTIRE FORM

***PLAINTIFF*** (the person suing): Within 60 days after filing the lawsuit, you must serve each Defendant with the *Complaint, Summons,* an *Alternative Dispute Resolution (ADR) Information Sheet,* and a copy of this *Civil Lawsuit Notice,* and you must file written proof of such service.

---

***DEFENDANT*** (The person sued): **You must do each of the following to protect your rights:**

1. You must file a **written response** to the *Complaint, using the proper legal form or format,* in the Clerk's Office of the Court, within **30 days** of the date you were served with the *Summons* and *Complaint;*
2. You must serve by mail a copy of your written response on the Plaintiff's attorney or on the Plaintiff if Plaintiff has no attorney (to "serve by mail" means to have an adult other than yourself mail a copy); and
3. You must attend the first Case Management Conference.

**Warning: If you, as the Defendant, do not follow these instructions, you may automatically lose this case.**

---

***RULES AND FORMS:*** You must follow the California Rules of Court and the Superior Court of California, County of <_CountyName_> Local Civil Rules and use proper forms. You can obtain legal information, view the rules and receive forms, free of charge, from the Self-Help Center at 201 North First Street, San José (408-882-2900 x-2926).

- State Rules and Judicial Council Forms: www.courtinfo.ca.gov/forms and www.courtinfo.ca.gov/rules
- Local Rules and Forms: http://www.sccsuperiorcourt.org/civil/rule1toc.htm

***CASE MANAGEMENT CONFERENCE (CMC):*** You must meet with the other parties and discuss the case, in person or by telephone at least 30 calendar days before the CMC. You must also fill out, file and serve a *Case Management Statement* (Judicial Council form CM-110) at least 15 calendar days before the CMC.

*You or your attorney must appear at the CMC. You may ask to appear by telephone – see Local Civil Rule 8.*

---

Your Case Management Judge is: **Hon. Brian C. Walsh**   Department: **1**

The 1st CMC is scheduled for: (Completed by Clerk of Court)
Date: **1/21/21**   Time: **2:30 pm**   in Department: **1**

The next CMC is scheduled for: (Completed by party if the 1st CMC was continued or has passed)
Date: _____   Time: _____   in Department: _____

---

***ALTERNATIVE DISPUTE RESOLUTION (ADR):*** If all parties have appeared and filed a completed *ADR Stipulation Form* (local form CV-5008) at least 15 days before the CMC, the Court will cancel the CMC and mail notice of an ADR Status Conference. Visit the Court's website at www.sccsuperiorcourt.org/civil/ADR/ or call the ADR Administrator (408-882-2100 x-2530) for a list of ADR providers and their qualifications, services, and fees.

***WARNING:*** Sanctions may be imposed if you do not follow the California Rules of Court or the Local Rules of Court.

# SANTA CLARA COUNTY SUPERIOR COURT
## ALTERNATIVE DISPUTE RESOLUTION
### INFORMATION SHEET

Many cases can be resolved to the satisfaction of all parties without the necessity of traditional litigation, which can be expensive, time consuming, and stressful. The Court finds that it is in the best interests of the parties that they participate in alternatives to traditional litigation, including arbitration, mediation, neutral evaluation, special masters and referees, and settlement conferences. Therefore, all matters shall be referred to an appropriate form of Alternative Dispute Resolution (ADR) before they are set for trial, unless there is good cause to dispense with the ADR requirement.

### What is ADR?
ADR is the general term for a wide variety of dispute resolution processes that are alternatives to litigation. Types of ADR processes include mediation, arbitration, neutral evaluation, special masters and referees, and settlement conferences, among others forms.

### What are the advantages of choosing ADR instead of litigation?
ADR can have a number of advantages over litigation:

- **ADR can save time.** A dispute can be resolved in a matter of months, or even weeks, while litigation can take years.

- **ADR can save money.** Attorney's fees, court costs, and expert fees can be reduced or avoided altogether.

- **ADR provides more participation.** Parties have more opportunities with ADR to express their interests and concerns, instead of focusing exclusively on legal rights.

- **ADR provides more control and flexibility.** Parties can choose the ADR process that is most likely to bring a satisfactory resolution to their dispute.

- **ADR can reduce stress.** ADR encourages cooperation and communication, while discouraging the adversarial atmosphere of litigation. Surveys of parties who have participated in an ADR process have found much greater satisfaction than with parties who have gone through litigation.

### What are the main forms of ADR offered by the Court?
**Mediation** is an informal, confidential, flexible and non-binding process in the mediator helps the parties to understand the interests of everyone involved, and their practical and legal choices. The mediator helps the parties to communicate better, explore legal and practical settlement options, and reach an acceptable solution of the problem. The mediator does not decide the solution to the dispute; the parties do.

Mediation may be appropriate when:
- The parties want a non-adversary procedure
- The parties have a continuing business or personal relationship
- Communication problems are interfering with a resolution
- There is an emotional element involved
- The parties are interested in an injunction, consent decree, or other form of equitable relief

**Neutral evaluation**, sometimes called "Early Neutral Evaluation" or "ENE", is an informal process in which the evaluator, an experienced neutral lawyer, hears a compact presentation of both sides of the case, gives a non-binding assessment of the strengths and weaknesses on each side, and predicts the likely outcome. The evaluator can help parties to identify issues, prepare stipulations, and draft discovery plans. The parties may use the neutral's evaluation to discuss settlement.

Neutral evaluation may be appropriate when:
- The parties are far apart in their view of the law or value of the case
- The case involves a technical issue in which the evaluator has expertise
- Case planning assistance would be helpful and would save legal fees and costs
- The parties are interested in an injunction, consent decree, or other form of equitable relief

*-over-*

**Arbitration** is a less formal process than a trial, with no jury. The arbitrator hears the evidence and arguments of the parties and then makes a written decision. The parties can agree to binding or non-binding arbitration. In binding arbitration, the arbitrator's decision is final and completely resolves the case, without the opportunity for appeal. In non-binding arbitration, the arbitrator's decision could resolve the case, without the opportunity for appeal, unless a party timely rejects the arbitrator's decision within 30 days and requests a trial. Private arbitrators are allowed to charge for their time.

Arbitration may be appropriate when:
- The action is for personal injury, property damage, or breach of contract
- Only monetary damages are sought
- Witness testimony, under oath, needs to be evaluated
- An advisory opinion is sought from an experienced litigator (if a non-binding arbitration)

**Civil Judge ADR** allows parties to have a mediation or settlement conference with an experienced judge of the Superior Court. Mediation is an informal, confidential, flexible and non-binding process in which the judge helps the parties to understand the interests of everyone involved, and their practical and legal choices. A settlement conference is an informal process in which the judge meets with the parties or their attorneys, hears the facts of the dispute, helps identify issues to be resolved, and normally suggests a resolution that the parties may accept or use as a basis for further negotiations. The request for mediation or settlement conference may be made promptly by stipulation (agreement) upon the filing of the Civil complaint and the answer. There is no charge for this service.

Civil Judge ADR may be appropriate when:
- The parties have complex facts to review
- The case involves multiple parties and problems
- The courthouse surroundings would be helpful to the settlement process

**Special masters and referees** are neutral parties who may be appointed by the court to obtain information or to make specific fact findings that may lead to a resolution of a dispute.
Special masters and referees can be particularly effective in complex cases with a number of parties, like construction disputes.

**Settlement conferences** are informal processes in which the neutral (a judge or an experienced attorney) meets with the parties or their attorneys, hears the facts of the dispute, helps identify issues to be resolved, and normally suggests a resolution that the parties may accept or use as a basis for further negotiations.
Settlement conferences can be effective when the authority or expertise of the judge or experienced attorney may help the parties reach a resolution.

### What kind of disputes can be resolved by ADR?
Although some disputes must go to court, almost any dispute can be resolved through ADR. This includes disputes involving business matters; civil rights; collections; corporations; construction; consumer protection; contracts; copyrights; defamation; disabilities; discrimination; employment; environmental problems; fraud; harassment; health care; housing; insurance; intellectual property; labor; landlord/tenant; media; medical malpractice and other professional negligence; neighborhood problems; partnerships; patents; personal injury; probate; product liability; property damage; real estate; securities; sports; trade secret; and wrongful death, among other matters.

### Where can you get assistance with selecting an appropriate form of ADR and a neutral for your case, information about ADR procedures, or answers to other questions about ADR?

**Contact:**

Santa Clara County Superior Court
ADR Administrator
408-882-2530

Santa Clara County DRPA Coordinator
408-792-2784

**ALTERNATIVE DISPUTE RESOLUTION INFORMATION SHEET**
**CIVIL DIVISION**